2000 ND 113

**Karen D. SCHIFF, Plaintiff and Appellant,**

v.

**Gary D. SCHIFF, Defendant and Appellee.**

No. 990335.

Supreme Court of North Dakota.

May 25, 2000.

Patti Jo Jensen, Galstad, Jensen & McCann, PA, East Grand Forks, MN, for plaintiff and appellant.

Mary E. Seaworth, Howe & Seaworth, Grand Forks, N.D., for defendant and appellee.

KAPSNER, Justice.

[¶ 1] Karen D. Schiff appeals from a divorce judgment, challenging the terms of visitation and the child support and spousal support awards. We affirm the trial court's decision on visitation and spousal support, but reverse the decision on child support and remand for a redetermination of that award.

I

[¶ 2] Karen Schiff and Gary D. Schiff were married in Moorhead, Minnesota on September 3, 1984, when she was 25 years old and he was 32 years old. The couple moved to Fort Lauderdale, Florida, where Karen worked as a court reporter and Gary worked as a stockbroker. On March 11, 1990, the couple's first son was born. Shortly after the birth, Gary purchased a Subway franchise in the Fort Lauderdale area. During this time period, Gary was addicted to prescription drugs, mainly Percocet, a pain medication. In 1992, he entered a drug rehabilitation treatment program and, according to Gary, he has not abused drugs since then.

[¶ 3] Gary became acquainted with the owner of Subway, and after Gary sold his Subway franchise, he accepted a position with Subway International as the regional manager for Australia. In late 1992, the family moved to Brisbane, Australia. Karen did not work outside the home while they lived in Australia, and on July 26, 1993, the couple's second son was born. After about two and one-half years in Australia, Gary was given an opportunity to become Subway International's regional manager for the Pacific Asian market. Gary would be required to move to one of the Asian countries he was overseeing, but Karen did not want to move to Asia because of the amount of travel involved with Gary's job. When Gary began his new position in 1995, Karen and the children left Australia and moved to Phoenix, Arizona, where her parents lived.

[¶ 4] While Karen and the children lived in Phoenix, Gary would travel from Asia to visit them about once every six weeks. Because Gary continually traveled overseas for his job, he did not set up a home base in an Asian country and considered Phoenix his home. Karen and the children lived in Phoenix from August 1995 until June 1996, when she and the boys moved to Grand Forks. Karen had grown up in North Dakota and had numerous relatives and friends in the area. Karen found employment as a medical transcriptionist and commenced this divorce action in August 1996.

[¶ 5] In March 1997, the trial court issued a temporary order granting Karen custody of the children and Gary "reasonable visitation as agreed upon between the parties," and ordering Gary to pay $1,936

per month child support and $800 per month "temporary spousal maintenance" pending trial of the divorce action. Visitation quickly became troublesome, on occasion necessitating the intervention of both parties' counsel as well as the trial court. Karen alleged Gary was again abusing drugs and attempted to limit visitation to times she could supervise the visits. She opposed any attempt by Gary to exercise visitation away from the Grand Forks area.

[¶ 6] The divorce trial took place in September 1998. At that time, Karen was employed as a clerical worker for a local court reporter and was beginning to do some court reporting work, securing a percentage split of income from each job. Karen and the boys were living in a rented townhouse in Grand Forks. Gary was still employed with Subway International as the regional manager for the Pacific Asian market. When not traveling on business or for visitation purposes, Gary lives in an apartment complex in Manila, Philippines. Gary agreed Karen should have physical custody of the boys, but sought reasonable visitation including extended summer visitation during which he could bring the boys to stay with him in Asia.

[¶ 7] The trial court orally rendered its decision in July 1999, and judgment was entered in October 1999. The court awarded physical custody of the children to Karen and awarded Gary unsupervised "reasonable and liberal visitation." Those visitation rights included six weeks during the summer, commencing in 2000, during which Gary would be allowed to take the boys along with him to Asia where he works. The court ordered that Gary pay $1,231 per month in child support. The court awarded Karen $800 per month in rehabilitative spousal support "for refresher training as a court reporter or other occupation of Karen's choice commencing November 1, 1999 and ending October 30, 2000 at which time the jurisdiction of the court as to spousal support shall end." Karen appealed.

II

[¶ 8] Karen argues the trial court erred in granting Gary extended summer visitation each year because it would be contrary to the boys' best interests.

[¶ 9] District courts have the authority to allow a noncustodial parent visitation rights. *Ackerman v. Ackerman,* 1999 ND 135, ¶ 13, 596 N.W.2d 332. The primary purpose of visitation is to promote the best interests of the children, not the wishes or desires of the parents. *Moilan v. Moilan,* 1999 ND 103, ¶ 29, 598 N.W.2d 81. Visitation with the noncustodial parent is presumed to be in the child's best interests and is not merely a privilege of the noncustodial parent, but a right of the child. *Hendrickson v. Hendrickson,* 2000 ND 1, ¶ 21, 603 N.W.2d 896. A noncustodial parent should be deprived of visitation only if "visitation is likely to endanger the child's physical or emotional health." N.D.C.C. § 14–05–22(2); *Ackerman* at ¶ 13. Denying a noncustodial parent visitation with a child is an onerous restriction, such that physical or emotional harm resulting from the visitation must be demonstrated in detail before it is imposed. *Hendrickson* at ¶ 21.

[¶ 10] A trial court's decision on visitation is a finding of fact which will not be reversed on appeal unless it is clearly erroneous under N.D.R.Civ.P. 52(a). *Zuger v. Zuger,* 1997 ND 97, ¶ 36, 563 N.W.2d 804. A finding of fact is clearly erroneous only if it is induced by an erroneous view of the law, if no evidence exists to support it, or if, upon review of the entire evidence, we are left with a definite and firm conviction that a mistake has been made. *State ex rel. Melling v. Ness,* 1999 ND 73, ¶ 7, 592 N.W.2d 565.

[¶ 11] Karen argues the trial court erred in granting Gary extended summer visitation because of Gary's "drug use and addiction compounded by the ready availability of the medications to which he is addicted overseas," Gary's "inappropriate

use of pornographic materials at a point where the boys could view them," Gary's "lack of involvement over the years with the boys," "issues of domestic violence," and "the inherent danger of travel overseas where [Gary] is employed."

## A

[¶ 12] Karen argues restricted visitation is appropriate because Gary is addicted to prescription drugs. *See generally Lohstreter v. Lohstreter*, 1998 ND 7, ¶¶ 9–13, 574 N.W.2d 790 (upholding visitation restrictions where noncustodial parent had continuing problem with alcohol). Gary testified about his abuse of drugs in the years before 1992. He admitted to "a lot of drug use in college" during the mid–1970s. After college he was fired from several jobs because of his drug use. Criminal charges were filed against him for forging a prescription for Quaaludes and he underwent his first drug treatment program in 1977 under order of a Florida court. He voluntarily entered drug treatment programs in 1983 and 1992. Gary testified why he had not been in any drug rehabilitation centers since 1992:

> I was at a point in my life where I was running a Subway store and I was taking a lot of pills, basically Percocet, and it got to a point where I was sick and tired of being sick and tired of the whole thing and I guess it was my bottom and that treatment program worked. I was ready to, you know, to turn it over to a higher power and since then things have been good.

[¶ 13] Karen testified that after completion of Gary's 1992 drug rehabilitation program, she discovered foil packs at their home containing Phenergan and Tylenol with codeine pills. Gary acknowledged that as late as 1997 he occasionally used Valium on long overseas flights to help him sleep and Tylenol with codeine for headaches. At the 1998 divorce trial, however, Gary testified he no longer used any drugs and denied ever being under the influence of drugs when he cared for the children.

[¶ 14] Karen also testified that during their marriage Gary had pornographic material in their home, but Gary testified he kept those materials on a shelf in his closet and never showed them to the boys.

[¶ 15] The trial court found:

> [W]hatever Mr. Schiff had done in his premarriage years he appears to have certainly led a life of a successful business man in his later years, not only successful personally but financially, and the Court is reasonably persuaded if his present conduct was like his former conduct he couldn't succeed [like] he does ... [T]here must have been a change for the better. And so it appears that throughout the marriage that Gary has attempted to be a productive member of society and has accomplished that goal.

[¶ 16] The trial court essentially found that Gary had changed over the years and his former behavior currently posed no threat to the well being of his children. The trial court's finding on this issue is supported by the record and is not clearly erroneous.

## B

[¶ 17] Karen contends the trial court erred in granting Gary extended summer visitation because he was not involved with the boys while they were growing up.

[¶ 18] Gary testified he was present at the older child's birth and held him every day. Gary was proud of his son and described that period as "probably the best time of my life." Gary admitted Karen primarily cared for the older child, but having purchased a Subway franchise, Gary spent a great amount of time tending to the business. Gary testified he spent his free time with the child.

[¶ 19] Gary was also present at the younger son's birth in Australia, and spent time caring for the older son while Karen was in the hospital. Gary's business travel in Australia was not extensive, requiring

that he "leave occasionally for a couple days." Gary spent considerable time playing with the boys and taking walks with them to explore Australian wildlife. When Gary became the first regional manager for Subway International's Pacific Asian market, Gary wanted to move the family to one of the countries in his territory so he could be closer to Karen and the boys, but Karen refused. Gary testified the Asian job was the only position available for him with Subway International, and he did not believe he could obtain a comparable job with another company in the United States. Since then, Gary has been able to visit the children about once every six weeks. The trial court found "[t]his is the only way that Gary can maintain a relationship with his children and still maintain the current employment."

[¶ 20] The evidence does not support Karen's argument that Gary has essentially "abandoned" his children, or that he would be unable to care for them during extended visitation periods.

### C

[¶ 21] Karen argues the trial court ignored evidence of domestic violence which should limit the amount of visitation awarded to Gary. Karen testified that in late 1984 or early 1985, she confronted Gary about pornographic material found in the house and he "pushed me up against [a] brick wall." Karen testified that in 1990, when the older son was six months old, Gary became angry when Karen discovered pills in a dresser drawer and "tossed" the child on the bed. Karen testified that Gary slapped her once during an airline flight in early 1993. Karen also testified that while she was in labor with the younger child in July 1993, Gary slapped, rather than massaged, her lower back during contractions. According to Karen, Gary verbally assaulted her in front of the older child in July 1995. The last incident occurred in August 1998 when Gary was exercising visitation at a hotel in Grand Forks. Because she believed Gary was using drugs, Karen went to his hotel room and began searching for drugs in the drawers. According to Karen, Gary "[g]rabbed me by my arms and shoved me up against the wall and was holding me there."

[¶ 22] Gary denied throwing the older son on the bed, slapping Karen during the airline flight, and verbally assaulting her. Gary remembered rubbing Karen's back during labor, but denied hitting her back. Gary claimed Karen attacked him once when they lived in Australia and she obtained bruises on her arm from him trying to hold her back and defend himself. With regard to the Grand Forks incident, Gary testified he attempted to stop Karen from searching through his personal items at the hotel room and tried to hold her back, but then left the room and called police. When the police officer arrived, Gary had scratches on his hand and his leg was bleeding from being kicked. The officer testified Gary declined to press charges against Karen. Prompted by Karen's complaints, Social Services investigated the situation. The Child Protection Team determined "no services would be required or recommended," and encouraged the parties to "work together toward the best interest of the children."

[¶ 23] Domestic violence can affect a noncustodial parent's visitation rights:

> If the court finds that a parent has perpetrated domestic violence and that parent does not have custody, and there exists one incident of domestic violence which resulted in serious bodily injury or involved the use of a dangerous weapon or there exists a pattern of domestic violence within a reasonable time proximate to the proceeding, the court shall allow only supervised child visitation with that parent unless there is a showing by clear and convincing evidence that unsupervised visitation would not endanger the child's physical or emotional health.

N.D.C.C. § 14-05-22(3). The evidence on domestic violence in this case was disput-

ed, but the trial court made no specific findings on Karen's allegations of domestic violence.

[¶ 24] While it would have been helpful if the trial court had addressed this evidence, we have said specific factual findings are not required when the evidence of domestic violence does not rise to the level of triggering the domestic violence presumption. *See Holtz v. Holtz*, 1999 ND 105, ¶ 27, 595 N.W.2d 1. Karen has not alleged a single incident of violence which resulted in serious bodily injury or involved the use of a dangerous weapon. Karen also has not alleged a pattern of domestic violence within a reasonable time proximate to the proceedings. Indeed, with regard to the most recent alleged incident of domestic violence in August 1998, Gary requested that police not arrest Karen. We conclude Karen's allegations are insufficient as a matter of law to raise the domestic violence presumption. *See, e.g., Brown v. Brown*, 1999 ND 199, ¶ 18, 600 N.W.2d 869 (holding domestic violence under statutory definition does not include name-calling). Even though evidence of domestic violence that does not trigger the presumption can still be considered, *see Reeves v. Chepulis*, 1999 ND 63, ¶ 15, 591 N.W.2d 791, we presume the trial court did not view this evidence as necessitating restricted visitation.

[¶ 25] Moreover, it appears from Karen's appellate brief that she no longer objects to unsupervised visitation, so long as the visits occur in the United States. Karen has thus effectively conceded that unsupervised visitation will not endanger the children's physical or emotional health. *See Zuger*, 1997 ND 97, ¶ 36, 563 N.W.2d 804. Therefore, supervised visitation under N.D.C.C. § 14–05–22(3) is not required.

### D

[¶ 26] Karen's strongest objection to the visitation award is to extended summer visitation during which Gary can take the boys to Asia. Karen does not argue Gary will abscond with the children while overseas, but argues there is an "inherent danger" in overseas travel, and political instability in some Asian countries demonstrates this aspect of the visitation award would be detrimental to the best interests of the boys.

[¶ 27] When there is a long distance between the homes of the custodial and noncustodial parents, we have approved visitation schedules which provide less frequent, but extended, visitation periods to preserve the noncustodial parent's ability to foster and develop a relationship with the child. *See, e.g., Tibor v. Tibor*, 1999 ND 150, ¶ 24, 598 N.W.2d 480. In these circumstances, "extended visitation during the summer months is likely the only feasible way to facilitate visitation from the standpoint of economics and transportation." *Love v. DeWall*, 1999 ND 139, ¶ 13, 598 N.W.2d 106. There is no presumption that overseas visitation is detrimental to a child's best interests. *See, e.g., Sumra v. Sumra*, 1997 ND 62, ¶ 17, 561 N.W.2d 290; *Bergstrom v. Bergstrom*, 320 N.W.2d 119, 124 (N.D.1982) (VandeWalle, J., concurring in part and dissenting in part). As we said in *Ness*, 1999 ND 73, ¶ 23, 592 N.W.2d 565, "modern transportation has allowed the measure of distance to be done in hours rather than days, and instant communication is available through phone links between a parent and child who live apart."

[¶ 28] Gary testified that during extended summer visitation, he would have the boys spend some time with his mother in Florida and then take them to Asia. Gary testified his apartment building in Manila is a secured building in a safe area of the city. Gary said when working he would either leave the boys with a day care center operated out of the apartment complex or hire a nanny to care for them. Although Gary currently spends only about nine days per month at his Manila home, he testified:

Well, during the time that they're there, whether it's a whole summer, probably shorter, I would work out my schedule so that I would spend more time there. And I can't say I'd spend all the time there but they would be well cared for if I did have to leave town for anything and possibly I envision trips where I could take them to see some other areas too. I envision this as like an educational thing, a cultural thing where they could learn about other parts of the world. So I'd like to take them with as much as I could.

[¶ 29] At the time the trial court rendered its oral decision in July 1999, the older child was nine years old and the younger was six years old. The court required that Gary accompany the boys on the trips and further required the boys receive "immunizations directed by the United States public health authority as being the appropriate and required immunizations for their age and the places where they are to travel." In addressing Karen's concerns, the trial court stated:

I think next year (summer 2000) would probably be ideal for a first trip of this sort. We live in a world [ ] economy ... I think it would be of great educational value for the boys to be able to make such a trip with their father next year. . . . Mr. Schiff is an accomplished traveler and I think that we could depend upon him to look after the safety and well-being of his children and that absent some disruption of civil order in any of those particular countries he should not be prohibited from taking the children to those countries. . . . [A] person needs to be on their guard, you need to be on your guard when you go to a big city in America. . . . [W]e have to be not xenophobic about travel in the foreign countries. . . .

So I think there's a great lesson for the children with concern through the careful—and I'm sure Gary would be careful with them—tutelage of their father.

[¶ 30] On this record, we cannot say that the trial court's award of extended overseas summer visitation to Gary is clearly erroneous.

## III

[¶ 31] Karen argues the trial court erred in calculating the child support award. Child support determinations involve questions of law which are subject to a de novo standard of review, findings of fact which are subject to the clearly erroneous standard of review, and, in some limited areas, may involve matters of discretion subject to the abuse of discretion standard of review. *Richter v. Houser*, 1999 ND 147, ¶ 3, 598 N.W.2d 193. A proper finding of net income is essential to a determination of the correct amount of child support under the child support guidelines. *Schumacher v. Schumacher*, 1999 ND 149, ¶ 33, 598 N.W.2d 131.

[¶ 32] Gary testified his income is derived from various employment sources. Gary receives a salary, a new store opening bonus, a bonus based on the net income of the stores in his region, a longevity bonus every three years, a royalty gains bonus, a new development agent bonus, and a year end bonus equal to one or two weeks of salary. After combining Gary's salary and bonuses, the court computed Gary's net monthly income to be $5,288 per month. Because of the substantial travel expenses incurred by Gary for visitation purposes, the trial court reduced the net monthly income amount by $944 under N.D. Admin. Code § 75–02–04.1–09(2)(i), to arrive at a net monthly income of $4,344, and set Gary's child support obligation at $1,231 per month.

### A

[¶ 33] Karen argues the trial court erred in deviating from the guidelines because "the record is devoid of any evidence regarding travel expenses." However, Gary presented evidence that his visitation travel expenses averaged approximately

$1,450 per month. The trial court reduced this amount by about one-third because "Gary will personally benefit from these travel expenses...." The trial court's reduction for travel expenses is within the parameters of the evidence and is not clearly erroneous.

### B

[¶ 34] Karen argues the trial court erred in failing to include the value of Gary's in-kind income in determining his child support obligation.

[¶ 35] Under the child support guidelines, gross income includes the "value of in-kind income received on a regular basis...." N.D. Admin. Code § 75–02–04.1–01(5)(b). "In-kind income" is "the receipt of any valuable right, property or property interest, ... including ... use of property, including living quarters at no charge or less than the customary charge, and the use of consumable property or services at no charge or less than the customary charge." N.D. Admin. Code § .75–02–04.1–01(6). The value of in-kind income must be considered in determining an obligor's gross income. *Cook v. Eggers*, 1999 ND 97, ¶ 6, 593 N.W.2d 781.

[¶ 36] Karen contends Gary's living expenses are minimal because he spends only nine days per month at his home and travels the rest of the time, for which his lodging, food and other travel expenses are paid by Subway International. According to Karen, these paid travel expenses are in-kind income which must be included in the child support calculation. Assuming for purposes of argument these paid travel expenses qualify as in-kind income, there must be evidence of the value of the items a party seeks to have included as in-kind income before the trial court may include those items in calculating an obligor's gross income. *See Wilhelm v. Wilhelm*, 1998 ND 140, ¶ 9, 582 N.W.2d 6. There was no evidence presented about the value of Gary's travel expenses. Consequently, the trial court did not err in failing to include the value of in-kind income in its computation of gross income.

### C

[¶ 37] Karen contends the trial court erred in failing to include in the child support calculation a $36,000 longevity bonus Gary receives every three years from Subway International. Gary last received the longevity bonus in 1998 and was scheduled to receive another one in 2001 if he continued in his present position with Subway International. The trial court deemed this income as a "speculative future bonus" and declined to consider it, reasoning:

It is the Court's opinion under the facts of this case that the stated *possibility* of a future bonus should not be engrafted upon the very substantial support already ordered in this case. Should such bonus or bonuses become a regular part of Gary's employment package, the statutes and regulations governing review and amendment of child support orders are adequate to meet the need.

(Emphasis in original). We believe the trial court erred in failing to include Gary's longevity bonus in the child support calculation.

[¶ 38] Recurrent payments must be considered in computing a parent's future child support obligation. *See Shaver v. Kopp*, 545 N.W.2d 170, 175–76 (N.D.1996). Averaging fluctuating income is also appropriate under the child support guidelines. *See Larson v. Larson*, 1998 ND 156, ¶ 9, 582 N.W.2d 657. The guidelines specifically provide "[w]here gross income is subject to fluctuation, ... information reflecting and covering a period of time sufficient to reveal the likely extent of fluctuations must be provided." N.D. Admin. Code § 75–02–04.1–02(7).

[¶ 39] Gary testified the longevity bonus "is paid once every three years for sticking it out overseas. And then it's renewed for another three years so it's a commitment for three years." Gary further explained the $36,000 is paid only after the employee

completes the three year commitment, and no partial bonuses are paid for less than three years of overseas service. Gary testified he "may be returning to the U.S. if the opportunity arises," "possibly next year," because the constant traveling associated with his job is "a tough life." However, Gary had no concrete plans to leave his position as regional manager for the Pacific Asian market.

[¶ 40] The evidence clearly shows that Gary will receive the longevity bonus in 2001 if he "stick[s] it out overseas." Whether Gary remains employed overseas appears to be within his control. Given these circumstances, the "only truly speculative scenario" is Gary will not receive the $36,000 bonus in 2001. *Fox v. Fox*, 1999 ND 68, ¶ 15, 592 N.W.2d 541. *See also Welder v. Welder*, 520 N.W.2d 813, 818 (N.D.1994). We conclude the trial court erred in not averaging the $36,000 longevity bonus over the three years it is intended to compensate Gary for his overseas employment. Adding $12,000 to Gary's annual income for each of the three years the bonus covers is more appropriate than requiring a redetermination of Gary's support obligation when his annual income suddenly balloons by $36,000 in 2001. If Gary obtains different employment, he may move for an appropriate adjustment if warranted by the circumstances. We therefore reverse the child support award and remand for recomputation and consideration of the longevity bonus.

### IV

[¶ 41] Karen argues the trial court erred in limiting the duration of her spousal support award to one year. The trial court awarded Karen rehabilitative spousal support of $800 per month from November 1999 through October 2000.

[¶ 42] Upon granting a divorce, the trial court may compel either of the parties to make such suitable allowances to the other for support as the court may deem just. N.D.C.C. § 14–05–24. Rehabilitative spousal support is appropriate when it is possible to restore an economically disadvantaged spouse to independent economic status, or to equalize the burden of divorce by increasing the disadvantaged spouse's earning capacity. *Riehl v. Riehl*, 1999 ND 107, ¶ 12, 595 N.W.2d 10. Rehabilitative spousal support is particularly appropriate when one spouse has bypassed opportunities or lost advantages as a consequence of the marriage or when one spouse has contributed during the marriage to the other's increased earning capacity or moved to further the other's career. *Moilan*, 1999 ND 103, ¶ 11, 598 N.W.2d 81. Although temporary spousal support to rehabilitate a disadvantaged spouse is preferred, it may be required indefinitely to maintain a spouse who cannot be adequately restored to independent economic status. *Greenwood v. Greenwood*, 1999 ND 126, ¶ 9, 596 N.W.2d 317. A relevant factor in setting the amount of support for a disadvantaged spouse is the distribution of marital property and the liquidity or income-producing nature of the property distributed to the disadvantaged spouse. *Wetzel v. Wetzel*, 1999 ND 29, ¶ 20, 589 N.W.2d 889. A trial court's spousal support determination is treated as a finding of fact and will not be reversed unless it is clearly erroneous. *Schumacher*, 1999 ND 149, ¶ 28, 598 N.W.2d 131.

[¶ 43] The trial court valued the marital estate at $94,351 and awarded Karen assets totaling $48,650 and Gary assets totaling $45,701. Gary was allocated $26,200 of the marital debt and Karen was allocated $7,500 of the marital debt. Both parties are relatively healthy. After graduating from high school Karen attended Moorhead State University for two years and obtained an associate of arts degree. She then attended the Minnesota School of Business for two years and obtained her certificate in court reporting in 1981. Prior to the family's move to Australia in 1992, Karen worked as a court reporter, earning as much as $60,000 one year. Karen was not employed outside the home

after the family moved to Australia, but cared for the children. At the time of trial, Karen was working for Lanelle's Reporting Service. When she first started, Karen was performing clerical duties and being paid $7.50 per hour. She has since then begun to perform court reporting services for a percentage split of the income from each job. Karen testified she was earning between $500 and $800 per month. Karen testified in order to be self-employed and competitive in the court reporting market she needed new equipment costing about $9,400. Gary's current salary with Subway International, including bonuses, is almost $70,000 per year. In the years in which he receives the longevity bonus, his annual income can exceed $100,000.

[¶ 44] During the trial, Karen requested $800 per month spousal support for "anywhere from eight to ten years." The trial court noted Karen "is a relatively young woman," she is skilled as a court reporter, and has the ability to "go free-lance, working with another free-lance company or independent self-employed person or on officialships." The court recognized Karen needed "some retraining to bring her back to speed," but noted that since the interim spousal support award of $800 per month was entered in March 1997, Karen had already received more than $25,000 in spousal support. The one year of spousal support awarded in the divorce decree will yield almost $10,000 of additional income. Karen has the professional skills and training to earn a significant income. The parties' marriage was relatively long-term, but Karen received a much larger share of the net marital estate.

[¶ 45] We conclude the trial court's award of $800 per month in rehabilitative spousal support for an additional one year period is not clearly erroneous under the circumstances of this case.

## V

[¶ 46] Karen argues this case should be reversed because of the substantial delay between the divorce trial and the court's ultimate decision. The trial was held in September 1998. The trial court rendered an oral decision in July 1999, about ten months after trial, and judgment was not entered until October 1999, about 13 months after trial.

[¶ 47] Karen relies on *Stewart v. North Dakota Workers Compensation Bureau*, 1999 ND 174, ¶¶ 20–29, 599 N.W.2d 280, where we held the Bureau's more than nine-month delay in issuing an appealable order and providing a post-termination hearing violated due process. However, *Stewart* is distinguishable because the Bureau, which caused the delay, was an adverse party in the proceeding. In the present case, the delay was not caused by a party to the proceeding, but by the court itself.

[¶ 48] We do not condone the lengthy delay between trial and decision in this case. However, a party complaining about delay in the decisionmaking process must demonstrate that the court committed an error of fact or law resulting from the delay to obtain relief. *See State v. Bonner*, 361 N.W.2d 605, 612 (N.D.1985) (holding trial court's grant of 55–day continuance during jury trial, and continuing with same jury, was not reversible error where appellant failed to demonstrate "the existence of prejudice in law or fact on this issue"). Here, Karen has not shown an error of fact or law resulted from the delay itself.

[¶ 49] We conclude Karen's argument that the divorce judgment should be reversed because of the delay between trial and decision is without merit.

## VI

[¶ 50] We affirm the trial court's decision on visitation and spousal support. We reverse the decision on child support and remand for a redetermination of that award based on the inclusion of the proper amount of Gary's upcoming longevity bonus. We deny Karen's request for ap-

pointment of a different trial judge on remand.

[¶ 51] WILLIAM A. NEUMANN, DALE V. SANDSTROM, MARY MUEHLEN MARING, JJ., concur.

VANDE WALLE, Chief Justice, concurring and dissenting.

[¶ 52] I concur in the majority opinion with the exception of part III C. Because I do not agree the child support guidelines provide for income averaging in this instance, I dissent to that part of the opinion.

[¶ 53] I do not disagree that the longevity bonus is income when received. It obviously is. N.D. Admin. Code § 75–02–04.1–01(5)(a)(b). However, I do not believe it is income until received. Insofar as the guidelines rely on the federal income tax return, N.D. Admin. Code § 75–02–04.1–02(7), to document "gross income," to require the inclusion of the bonus before it is actually earned is contrary to the guidelines.

[¶ 54] I am particularly concerned about the majority's "income averaging" of the bonus. It is earned by working for three years but it is not earned proportionately each year under Gary's employment contract. All three years must be completed. The guidelines use income averaging but it is apparently limited to income from self-employment. N.D. Admin. Code § 75–02–04.1–05(5). Even in that instance, it is limited to the "most recent" five years of business operations.

[¶ 55] I have no doubt Karen should share in the bonus when it is received. The trial court should make provisions that if the bonus is earned in 2001 the child support payments will increase accordingly for that year and then be reduced until the next bonus is earned. *See, Helbling v. Helbling,* 541 N.W.2d 443, 448–49 (N.D.1995) (VandeWalle, C.J., concurring) (observing better procedure is for trial court to automatically provide for a reduction in support when the effect of a "windfall" ceases).

[¶ 56] The majority's provision for averaging the longevity bonus has merit, but I do not find support for the procedure in the guidelines. The majority states averaging fluctuating income is appropriate under the guidelines and quotes in part N.D. Admin. Code § 75–02–04.1–02(7). That section provides in total:

> Income must be documented through the use of tax returns, current wage statements, and other information sufficiently to full apprise the court of all gross income. Where gross income is subject to fluctuation, *particularly in instances involving self-employment,* information reflecting and covering a period of time sufficient to reveal the likely extent of fluctuations must be provided." (Emphasis added).

Gary is not self employed.

[¶ 57] I would direct the trial court to amend the judgment to provide that if in the year 2001 Gary receives the longevity bonus his child support obligation should increase accordingly for that year and reduce for the following year. *See* N.D. Admin. Code § 75–02–04.1–02(8) (stating "[i]f circumstances that materially affect the child support obligation are very likely to change in the near future, consideration may be given to the likely future circumstances.").

[¶ 58] Gerald W. Vande Walle, C.J.