2001 ND 176

**Sharon A. McDOWELL, Plaintiff and Appellee**

v.

**Jefferey T. McDOWELL, Defendant and Appellant.**

**No. 20010056.**

Supreme Court of North Dakota.

Nov. 2, 2001.

Carol K. Larson, Pringle & Herigstad, P.C., Minot, ND, for plaintiff and appellee.

Robert S. Rau, Bosard, McCutcheon & Rau, Ltd., Minot, ND, for defendant and appellant.

KAPSNER, Justice.

[¶ 1] Jefferey T. McDowell appealed from an amended judgment granting Sharon A. McDowell a divorce, dividing the couple's marital property, granting Sharon custody of the couple's son and Jefferey visitation rights, and ordering Jefferey to pay child support. We conclude the trial court's rulings on property distribution, spousal support, visitation and attorney fees are not erroneous. We further conclude the trial court's rulings on child custody and child support are erroneous as a matter of law. We affirm the amended judgment in part, but reverse the child custody and child support awards and remand for further proceedings.

I

[¶ 2] Sharon and Jefferey McDowell married in 1988, and had a son, Roy Dennis McDowell, born in 1990. At the time of trial, Jefferey was 36 years old and Sharon was 35 years old. During the marriage, Jefferey was initially employed as a neon tube bender at Bacon Signs in Minot earning between $8.50 and $9 per hour. In 1995, Jefferey had to leave that job

because of a work-related shoulder injury. In 1996, Jefferey had surgery on his left shoulder, and his doctors have required that he not use his left shoulder for repeated overhead work and lifting. Jefferey received workers compensation benefits, including vocational rehabilitation in the form of two years of computer training for an associate of arts degree. Jefferey's tuition and books were paid for by the Workers Compensation Bureau and he received $1,400 per month for income replacement benefits while attending college. In January 1999, Jefferey obtained part-time employment at Computer Integration in Minot, working 20 to 25 hours a week for $7.50 per hour. He worked there until May 1999, when he left the family and moved to California. At the time of trial, Jefferey was a full-time student at Minot State University in the process of completing his bachelor of arts degree with financial assistance from Vocational Rehabilitation. He continues to work part-time for $7.50 per hour, and acknowledged there is no physical reason he could not work full-time at his computer job.

[¶ 3] Sharon has a two-year associate of arts degree as a legal secretary. During the marriage, Sharon worked full-time at Cargill, Inc., and at the time of trial, was earning $9.65 per hour plus other benefits. Sharon has elevated pressure in her eyes and is "glaucoma suspect," and needs anti-reflective lenses for night driving. She does not consider her eye problems to be serious. Roy was eight years old at the time of trial. He was not doing well in school and his teachers suggested he be tested for learning disabilities. Jefferey refused to allow Roy to be tested for learning disabilities because he did not want Roy to "carry a label for a lifetime." After Jefferey moved to California, Sharon had Roy tested for learning disabilities. When Jefferey returned to Minot from California in June 1999, Sharon commenced this divorce action.

[¶ 4] The trial court granted the divorce and divided the marital property, awarding Sharon a net amount valued at $34,872, and awarding Jefferey a net amount valued at $28,337. The court denied Jefferey's request that Sharon pay him spousal support. The court further awarded Sharon custody of Roy, subject to Jefferey's right of visitation, and ordered Jefferey to pay $250 per month for child support retroactive to July 1, 1999. The court also denied Jefferey's request for partial attorney fees. Jefferey appealed.

II

[¶ 5] Jefferey argues the property distribution is inequitable because Sharon received the bulk of the couple's assets.

[¶ 6] In *Heinz v. Heinz*, 2001 ND 147, ¶ 5, 632 N.W.2d 443, we recently summarized:

In a divorce, the trial court must distribute the marital property equitably between the parties. N.D.C.C. § 14–05–24. All of the parties' assets, regardless of the source, must be considered to ensure an equitable distribution of the marital property. *Kautzman v. Kautzman*, 1998 ND 192, ¶ 10, 585 N.W.2d 561. A trial court's distribution of marital property need not be equal to be equitable, but the court must explain any substantial disparity. *Corbett v. Corbett*, 2001 ND 113, ¶ 12, 628 N.W.2d 312. In distributing marital property, the trial court must apply the guidelines established under *Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (1952) and *Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966):

These guidelines allow the trial court, in making a property distribution, to consider the respective ages of the parties to the marriage; their earning abilities; the duration of the marriage

and the conduct of each during the marriage; their station in life; the circumstances and necessities of each; their health and physical conditions; their financial circumstances as shown by the property owned at the time; its value and income-producing capacity, if any, and whether it was accumulated or acquired before or after the marriage; and such other matters as may be material.

*Freed v. Freed*, 454 N.W.2d 516, 520 n. 3 (N.D.1990). Under the *Ruff–Fischer* guidelines, both economic and noneconomic fault are proper factors for the trial court to consider in dividing marital property. *Hoverson v. Hoverson*, 2001 ND 124, ¶ 17, 629 N.W.2d 573.

[¶ 7] The trial court's determinations regarding division of marital property are treated as findings of fact and will not be reversed unless they are clearly erroneous under N.D.R.Civ.P. 52(a). *Mellum v. Mellum*, 2000 ND 47, ¶ 14, 607 N.W.2d 580. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, on the entire evidence the reviewing court is left with a definite and firm conviction a mistake has been made. *Id.* at ¶ 9.

[¶ 8] The trial court found the net worth of the couple's marital property to be $63,209. The court awarded Sharon the major assets, consisting mainly of the parties' mobile home and her Cargill retirement benefits, which totaled $62,558. The court allocated to Sharon $20,439 in family debts and one-half of $14,494, or $7,247, spent by Jefferey before the divorce, for a net award of $34,872. The court awarded Jefferey property valued at $34,826, consisting mainly of bank accounts and money market and stock mutual funds and one-half of the $14,494, or $7,247,

spent by Jefferey before the divorce. Jefferey was allocated $6,489 of the family debt, for a net award of $28,337. The court noted the property distribution was not equal, but was equitable under the circumstances:

Jeff left for California with the knowledge that Sharon and their son would not be following, but would remain here in Minot. Jeff closed out accounts of approximately $14,500 to travel to California and ..., at the time he closed those accounts out, the money was "family money" though some of the accounts were in his name alone. These funds are marital assets and equity requires that they be taken into consideration when making the equitable distribution of assets. While the distribution of assets is not equal, it is equitable. Sharon requires the mobile home to provide a home for the minor child. Jeff has not provided financial support for the minor child while this action has been pending, with the exception of purchasing a few items of personal property for Roy, and a limited amount of medical expenses.

[¶ 9] Jefferey argues he is innocent of the wrongful conduct attributed to him by the trial court. Jefferey testified he and Sharon agreed he would move to California to further his education and find a better job in the computer industry and Sharon and Roy would move to California when he became established. However, there is substantial evidence to support the trial court's contrary finding. Sharon testified she and Jefferey discussed his move to California and made detailed plans about how Sharon should handle financial matters in North Dakota. Jefferey offered to return his wedding ring to Sharon. Jefferey bought a second computer so he could communicate with Roy while living in California. Jefferey's "best friend" since childhood testified Jefferey intro-

duced him on the computer to a woman in California he had met on the Internet, Jefferey told him he was "unhappy" with Sharon's vision problems and Roy's educational problems, and Jefferey said "he was leaving and he didn't care if he ever came back to North Dakota."

[¶ 10] Sharon received approximately 55 percent of the net marital estate and Jefferey received about 45 percent. The disparity is adequately explained by the trial court's finding that Jefferey used family funds and essentially abandoned the family. We conclude the trial court's distribution of marital property is not clearly erroneous.

### III

[¶ 11] Jefferey argues the trial court erred in failing to award him spousal support because of his previous work-related injury and because he was "disadvantaged by the relationship."

[¶ 12] Upon granting a divorce, a trial court may compel either party to make such suitable allowances to the other for support as the court may deem just. N.D.C.C. § 14–05–24. Property division and spousal support are interrelated, and the *Ruff–Fischer* guidelines also apply when determining whether spousal support should be awarded. *Heinz*, 2001 ND 147, ¶ 11, 632 N.W.2d 443.

Spousal support is aimed at balancing the burdens and disadvantages created by the divorce. We recognize permanent and rehabilitative spousal support as two distinct remedies. Permanent support is appropriate when the economically disadvantaged spouse cannot be equitably rehabilitated to make up for the opportunities and development she lost during the course of the marriage.

Rehabilitative spousal support, on the other hand, is appropriate when it is possible to restore an economically disadvantaged spouse to independent economic status, or to equalize the burden of divorce by increasing the disadvantaged spouse's earning capacity. There are two approaches to awarding rehabilitative spousal support. One is the "minimalist doctrine" which has as its objective rehabilitating the recipient for minimal self-sufficiency. We have rejected this doctrine in favor of the more "equitable" approach to determining rehabilitative spousal support, which attempts to provide education, training, or experience that will enable the recipient to achieve "adequate" or "appropriate" self-support while improving her employment skills.

*Riehl v. Riehl*, 1999 ND 107, ¶¶ 11–12, 595 N.W.2d 10 (citations omitted). A disadvantaged spouse is one who has foregone opportunities or lost advantages as a consequence of the marriage and who has contributed during the marriage to the supporting spouse's increased earning capacity. *Corbett v. Corbett*, 2001 ND 113, ¶ 19, 628 N.W.2d 312. The health and physical conditions of the parties are also significant factors to consider in awarding spousal support. *See Theis v. Theis*, 534 N.W.2d 26, 28 (N.D.1995); *van Oosting v. van Oosting*, 521 N.W.2d 93, 101 (N.D. 1994).

[¶ 13] Spousal support determination must be made in light of the income and needs of the disadvantaged spouse and of the supporting spouse's needs and ability to pay. *Marschner v. Marschner*, 2001 ND 4, ¶ 6, 621 N.W.2d 339; *Laude v. Laude*, 1999 ND 203, ¶ 13, 600 N.W.2d 848. Earned income is not the sole consideration in determining a party's ability to pay support, and a court must consider the party's net worth, including the extent of the party's assets and the party's earning ability as demonstrated by past income.

*Schmitz v. Schmitz,* 2001 ND 19, ¶ 10, 622 N.W.2d 176. A trial court's determination on spousal support is treated as a finding of fact which will not be set aside on appeal unless clearly erroneous. *Schiff v. Schiff,* 2000 ND 113, ¶ 42, 611 N.W.2d 191.

[¶ 14] Although the trial court noted Sharon has "minor health problems" and Jefferey has "major health problems," the court denied Jefferey's request for spousal support, reasoning:

> [Jeff] has been rehabilitated by Worker[']s Compensation. Jeff is in a better position to obtain better employment tha[n] he now has. Even if he is to attend the University on a part or full time basis, he is capable of earning more than he now is. Jeff has not demonstrated his need nor Sharon's ability to pay spousal support.

[¶ 15] Jefferey's health problem involves his left shoulder which doctors operated on and ordered he not use "for repeated or manual labor." Jefferey and another man nevertheless built a shed, a walkway and an entryway onto the family's mobile home. When Jefferey was unable to continue employment as a neon tube bender for Bacon Signs, where he received between $8.50 and $9 per hour, he received retraining in computer sciences through the Workers Compensation Bureau, resulting in an associate of arts degree, as well as income replacement benefits of $1,400 per month. Since January 1999, Jefferey has been working part-time at a computer store earning $7.50 per hour, and Jefferey acknowledged he is physically able to work in his present position full-time. Jefferey, through Vocational Rehabilitation, is currently in the process of completing a four-year bachelor of arts degree. Upon completion of his education, Jefferey's earning capacity will most likely increase. Although the health problem with Jefferey's

left shoulder is no doubt "major" in the sense the injury prevented him from continued employment with Bacon Signs and other types of manual labor, it is a far cry from the health conditions present in *Theis* and *van Oosting,* where this Court held trial courts should retain jurisdiction to award spousal support when facing uncertainty about the need for permanent support. In *Theis,* 534 N.W.2d at 28, we held the trial court did not err in retaining jurisdiction to make a future award of spousal support to the wife where the husband had a "prognosis for unemployment due to his lymphatic cancer." In *van Oosting,* 521 N.W.2d at 100, we held the trial court should at least retain jurisdiction to award spousal support to the wife where the wife's " 'ability to earn will be at low income and will be affected by her' " multiple sclerosis. In this case, it is likely Jefferey's earning capacity will be enhanced through education partially financed by the Workers Compensation Bureau and Vocational Rehabilitation. Nevertheless, the court may wish to consider retaining jurisdiction to award spousal support in the future. *See van Oosting,* 521 N.W.2d at 101.

[¶ 16] Jefferey has received grants and loans to continue to pursue his four-year college degree, and is eligible for further workers compensation benefits if he is employed. He works part-time at the computer store receiving $7.50 per hour. Sharon, who has an associate of arts degree in the legal secretary field, recently received a raise at Cargill and now earns $9.65 per hour, with monthly take-home pay of $1,350 per month. Although Sharon received a slightly larger share of the marital estate, the vast majority of the assets awarded to her are not liquid. The mobile home and her Cargill retirement benefits amount to more than $55,000 of her total award, and the debt allocated to

her for the mobile home is more than $20,000. Jefferey was awarded more of the truly liquid assets, including bank accounts, and money market and stock mutual funds.

[¶ 17] Under these circumstances, we conclude the trial court's finding Jefferey had demonstrated no need for, or Sharon's ability to pay, either rehabilitative or permanent spousal support is not clearly erroneous.

### IV

[¶ 18] Jefferey argues the trial court erred in granting custody of Roy to Sharon.

### A

[¶ 19] Jefferey argues the trial court erred in awarding custody to Sharon because the court would not allow Roy to testify during the trial "due to the age of the child."

[¶ 20] Under N.D.C.C. § 14–09–06.2(1)(i), the "reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference," is one factor the trial court may consider in determining the best interest of the child. A court may refuse to consider a child's preference for custody if the child is not mature. *See Tishmack v. Tishmack,* 2000 ND 103, ¶ 22, 611 N.W.2d 204. If the trial court receives no evidence about the child's preference because of the child's young age, the court has implicitly determined the child is not capable of intelligently choosing between parents. *See Schneider v. Livingston,* 543 N.W.2d 228, 232 (N.D. 1996). At the time of trial, Roy was eight years old and in the third grade. The trial court addressed the preference factor, and we conclude its finding is not clearly erroneous.

### B

[¶ 21] Jefferey argues the trial court erred in awarding custody to Sharon because the trial court did not rationally explain its decision.

[¶ 22] In making an initial custody determination, a trial court must base custody on the best interest and welfare of the child, considering all of the factors listed in N.D.C.C. § 14–09–06.2(1):

a. The love, affection, and other emotional ties existing between the parents and child.

b. The capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.

c. The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.

d. The length of time the child has lived in a stable satisfactory environment and the desirability of maintaining continuity.

e. The permanence, as a family unit, of the existing or proposed custodial home.

f. The moral fitness of the parents.

g. The mental and physical health of the parents.

h. The home, school, and community record of the child.

i. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

j. Evidence of domestic violence . . . .

k. The interaction and interrelationship, or the potential for interaction and interrelationship, of the child

with any person who resides in, is present, or frequents the household of a parent and who may significantly affect the child's best interests. . . .

l. The making of false allegations not made in good faith, by one parent against the other, of harm to a child as defined in section 50–25.1–02.

m. Any other factors considered by the court to be relevant to a particular child custody dispute.

We do not require a separate finding for each statutory factor under N.D.C.C. § 14–09–06.2(1), provided we can understand the factual basis for the court's decision. *Reeves v. Chepulis*, 1999 ND 63, ¶ 16, 591 N.W.2d 791.

[¶ 23] This Court has recognized a trial court has a difficult choice to make in deciding custody between two fit parents. *Ackerman v. Ackerman*, 1999 ND 135, ¶ 8, 596 N.W.2d 332. We will not retry the case or substitute our judgment for the trial court's, if its determination is supported by evidence in the record. *Hogue v. Hogue*, 1998 ND 26, ¶ 9, 574 N.W.2d 579. A court's custody determination is a finding of fact which will not be reversed on appeal unless it is clearly erroneous. *Corbett*, 2001 ND 113, ¶ 6, 628 N.W.2d 312.

In this case, the trial court briefly addressed the best interest factors and found:

Sharon and Jeff are basically equal in factors (a) love and affection; (b) capacity and disposition to give love, affection, and guidance; (c) disposition of parents to provide child with food, clothing, and the like; (e) permanence of family unit; and (h) home, school, community record of the child. Sharon has an edge in item (g) mental and physical health of the parent, as she has minor health problems while Jeff has major health problems which ultimately caused him to not

be able to continue his employment at Bacon Sign Company. Factor (i) preference of the child, is not applicable due to the age of the child. Factor (d) stable environment, is not applicable for since the issuance of the Interim Order in this case, this child has not had what would be called a stable home life. Once the Interim Order is issued, and the Summons and Complaint are served, stability in the home life of a child is upset. Factor (j) domestic violence, is not applicable for, fortunately, there is no testimony as to domestic violence on the part of either party. Factor (k) interaction with other persons, is only Jeff's alleged interactions with a women [sic] on the Internet. Factors (*l*) and (m) are irrelevant. Overall, the best interests of the child require that Sharon receive care, custody and control of the minor child.

Although the parties disputed who was the "primary caretaker" of Roy, the trial court made no findings on the issue. *See Kjelland v. Kjelland*, 2000 ND 86, ¶ 15, 609 N.W.2d 100 (noting although the primary caretaker rule has not been given presumptive status in this state, it is a relevant factor to be considered by the trial court).

[¶ 24] From its written finding on the best interest factors, it appears the trial court relied on only factors (k) and (g) in ruling Sharon should have custody of Roy. However, by the trial court prefacing Jefferey's interaction with the woman on the Internet with the word "alleged," it is impossible for us to determine what weight, if any, the court gave to factor (k). The finding that Jeff has "major health problems" and Sharon has "minor health problems" could tip the balance in Sharon's favor under factor (g), but this Court has indicated the relevant inquiry is not merely whether a parent has mental or physical health problems, but whether

those health problems might adversely affect the parent's ability to care for the child. *See, e.g., Mayo v. Mayo,* 2000 ND 204, ¶¶ 31–35, 619 N.W.2d 631; *Ackerman,* 1999 ND 135, ¶¶ 10–11, 596 N.W.2d 332; *Daley v. Gunville,* 348 N.W.2d 441, 447 (N.D.1984). While an actual adverse effect need not be demonstrated before health can be considered in making a custody award, more than conjecture and speculation is required. *Daley,* 348 N.W.2d at 447. The trial court made no findings on how the parties' respective health problems adversely affected their ability to care for the child.

[¶ 25] Although Sharon argues the court's finding that "Jeff left for California with the knowledge that Sharon and their son would not be following" and he "closed out" family accounts totaling about $14,500 supports the custody decision, the court appears to have considered this conduct only in relation to its effect on the property distribution. The court does not mention Jefferey's move to California in its custody analysis, and expressly noted factor (m), which encompasses any other factors considered by the court to be relevant to a child custody dispute, was "irrelevant."

[¶ 26] The trial court's analysis of the custody issue is cryptic and confusing, leaving us unable to discern the factual basis for its award of custody to Sharon. We therefore conclude the court erred in failing to explain its grant of custody to Sharon, and we remand for reconsideration and for the preparation of findings that sufficiently explain its custody decision.

## V

[¶ 27] Jefferey argues the visitation rights awarded him by the trial court are "grossly inadequate and inappropriate." If the court again awards custody to Sharon, the visitation issue will arise on remand, *see Schlossman & Gunkelman, Inc. v. Tallman,* 1999 ND 89, ¶ 30, 593 N.W.2d 374, and therefore we will address it.

[¶ 28] Trial courts have the authority to allow a noncustodial parent visitation rights. *Ackerman,* 1999 ND 135, ¶ 13, 596 N.W.2d 332. The primary purpose of visitation is to promote the best interest of the child, not the wishes or desires of the parents. *Schiff,* 2000 ND 113, ¶ 9, 611 N.W.2d 191. Visitation with the noncustodial parent is presumed to be in the child's best interest, *see K.L.G. v. S.L.N.,* 2001 ND 33, ¶ 11, 622 N.W.2d 232, and is not merely a privilege of the noncustodial parent, but a right of the child. *Hendrickson v. Hendrickson,* 2000 ND 1, ¶ 21, 603 N.W.2d 896. A noncustodial parent's visitation with a child can be deprived or severely restricted only if it is likely to endanger the child's physical or emotional health. *Schiff,* at ¶ 9; N.D.C.C. § 14-05-22(2). A trial court's decision on visitation is a finding of fact which will not be reversed on appeal unless it is clearly erroneous. *Lukenbill v. Fettig,* 2001 ND 47, ¶ 17, 623 N.W.2d 7.

[¶ 29] The trial court granted Jefferey visitation with Roy every other weekend while he lives in the same community as Sharon and visitation on alternating major holidays. Jefferey was also awarded two months of summer visitation with Roy. Although Jefferey wanted "weekly visitation" during the rest of the year, he has not convinced us the visitation awarded by the trial court in this case is clearly erroneous. In its reconsideration of custody, however, the trial court may adjust visitation.

## VI

[¶ 30] Jefferey argues the trial court erred in calculating his child support

obligation at $250 per month retroactive to July 1, 1999. If the court again awards custody to Sharon, this issue will arise on remand, *see Tallman,* 1999 ND 89, ¶ 30, 593 N.W.2d 374, so we will address it.

[¶ 31] Child support determinations involve questions of law which are subject to the de novo standard of review, findings of fact which are subject to the clearly erroneous standard of review, and may, in some limited areas, be matters of discretion subject to the abuse of discretion standard. *Buchholz v. Buchholz,* 1999 ND 36, ¶ 11, 590 N.W.2d 215. A court errs as a matter of law when it fails to comply with the requirements of the child support guidelines in determining an obligor's child support obligation. *Heinz,* 2001 ND 147, ¶ 16, 632 N.W.2d 443.

[¶ 32] In this case, the trial court found Jefferey makes $7.50 per hour at his part-time job, but that "he is capable of earning more than he now is." The court multiplied $7.50 per hour times 167 hours to reflect Jefferey's monthly salary if he were working full-time. The court then computed his total net monthly income to be $1,043, resulting in a child support obligation of $250 per month.

[¶ 33] By finding Jefferey is capable of earning more than he presently earns, the trial court presumably found Jefferey was underemployed. A trial court is authorized to impute income to an obligor only if the obligor is unemployed or underemployed. *Lohstreter v. Lohstreter,* 2001 ND 45, ¶ 22, 623 N.W.2d 350. However, N.D. Admin. Code § 75–02–04.1–07 imposes strict rules for imputing income to an obligor in cases of unemployment or underemployment:

2. An obligor is presumed to be underemployed if the obligor's gross income from earnings is less than:

a. Six-tenths of prevailing amounts earned in the community by persons with similar work history and occupational qualifications; or

b. One hundred sixty-seven times the federal hourly minimum wage.

3. Except as provided in subsections 4, 5, and 9, monthly gross income based on earning capacity equal to the greatest of subdivisions a through c, less actual gross earnings, must be imputed to an obligor who is unemployed or underemployed.

a. An amount equal to one hundred sixty-seven times the hourly federal minimum wage.

b. An amount equal to six-tenths of prevailing gross monthly earnings in the community of persons with similar work history and occupational qualifications.

c. An amount equal to ninety percent of the obligor's greatest average gross monthly earnings, in any twelve consecutive months beginning on or after thirty-six months before commencement of the proceeding before the court, for which reliable evidence is provided.

The method used by the trial court to calculate Jefferey's child support obligation does not conform with the child support guidelines.

[¶ 34] We conclude the trial court's child support calculation is erroneous as a matter of law, and we reverse the child support award and remand for recomputation in accordance with the child support guidelines, should the court again grant Sharon custody.

## VII

[¶ 35] Jefferey argues the trial court erred in failing to award him partial attorney fees in this case.

[¶ 36]  A trial court has discretion under N.D.C.C. § 14–05–23 to award attorney fees in divorce proceedings.  *Brown v. Brown,* 1999 ND 199, ¶ 36, 600 N.W.2d 869.  In deciding whether to award attorney fees, the court must balance the parties' needs and ability to pay, and should consider the property owned by each, their relative incomes, whether property is liquid or fixed assets, and whether the action of either party unreasonably increased the time spent on the case.  *Reiser v. Reiser,* 2001 ND 6, ¶ 15, 621 N.W.2d 348.  An award of attorney fees is within the sound discretion of the trial court and will not be set aside on appeal absent an abuse of discretion.  *Weigel v. Weigel,* 2000 ND 16, ¶ 16, 604 N.W.2d 462.

[¶ 37]  We cannot say the trial court abused its discretion in ordering that each party be responsible for their own attorney fees.  Sharon's income is somewhat limited, her earning capacity at this time is similar to Jefferey's, and Sharon's property distribution is not as liquid as Jefferey's and is not substantially more in amount than Jefferey received.  The trial court did not abuse its discretion in refusing to award Jefferey partial attorney fees.

### VIII

[¶ 38]  We affirm the amended divorce judgment in part, but reverse the child custody and child support awards and remand for further proceedings.

[¶ 39]  VANDEWALLE, C.J., MARING, NEUMANN and SANDSTROM, JJ., concur.