2001 ND 148

**Bradley John STOPPLER, Plaintiff and Appellee,**

v.

**Kyle Kaye STOPPLER, Defendant and Appellant.**

No. 20000330.

Supreme Court of North Dakota.

Aug. 29, 2001.

Donavin L. Grenz, Linton, ND, for plaintiff and appellee.

Patricia E. Garrity, Bair, Bair, Garrity & Kelsch, LLP, Mandan, ND, for defendant and appellant.

Anne Elizabeth Summers, Bismarck, ND, Guardian ad Litem, participated under N.D.R.Ct. 8.7(e).

NEUMANN, Justice.

[¶ 1] Kyle Kaye Stoppler has appealed the September 27, 2000, judgment entered in a divorce action filed by Bradley John Stoppler. We reverse in part, affirm in part, and remand for further proceedings.

[¶ 2] The parties married in 1992. A daughter, KayLee, was born to the parties in 1993. Kyle's two children from a previous marriage lived with the parties on a farm. Bradley farmed and ranched, and Kyle worked outside the home during most of the marriage. Kyle twice took the children and left Bradley. In 1999 Kyle became romantically involved with Keith Hagen. On September 11, 1999, Kyle told Bradley she wanted a divorce and disclosed her affair with Hagen. Kyle and the children moved out of the marital home on September 19, 1999, to live with Kyle's mother.

[¶ 3] Bradley sued for a divorce on September 23, 1999. After a hearing, the trial court issued an amended interim order granting Bradley temporary custody of KayLee, prohibiting Kyle from permitting "KayLee to associate with or be in the presence of Keith Hagen," and giving Kyle "visitation with KayLee for three days during the week and on alternating weekends." The judgment entered on September 27, 2000, granted Bradley a divorce "on the grounds that [Kyle Stoppler's] adulterous relationship with Keith Hagen has caused irreconcilable differences between them"; awarded Bradley the care, custody, and control of KayLee; granted Kyle reasonable visitation, including alternating weekends and eight weeks of continuous summer visitation; determined Kyle's monthly net income and fixed her child support obligation at $50 per month; distributed the parties' marital property; specified "[n]o spousal support is awarded to Defendant"; directed Bradley to pay the Guardian ad Litem $2,015.48; and directed Bradley to pay $2,500 of Kyle's attorney fees within 60 days.

[¶ 4] Kyle filed a notice of appeal and a motion for a stay of the custody and child support provisions pending the outcome of the appeal. The trial court denied the motion in an order issued January 16, 2001. Kyle contends the trial court's determinations on custody, visitation, property division, and its failure to award her spousal support are clearly erroneous.

I

[¶ 5] Kyle contends the trial court's custody determination is clearly erroneous. In making an initial custody determination, a trial court must base custody on the best interest and welfare of the child, considering all of the factors listed in N.D.C.C. § 14–09–06.2(1). *Reeves v. Chepulis*, 1999 ND 63, ¶ 10, 591 N.W.2d 791.

[¶ 6] Section 14–09–06.2(1), N.D.C.C., provides in part:

1. For the purpose of custody, the best interests and welfare of the child is determined by the court's consideration and evaluation of all factors affecting the best interests and welfare of the child. These factors include all of the following when applicable:

 a. The love, affection, and other emotional ties existing between the parents and child.

 b. The capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.

 c. The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.

 d. The length of time the child has lived in a stable satisfactory environment and the desirability of maintaining continuity.

 e. The permanence, as a family unit, of the existing or proposed custodial home.

 f. The moral fitness of the parents.

g. The mental and physical health of the parents.

h. The home, school, and community record of the child.

i. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

j. Evidence of domestic violence....

k. The interaction and interrelationship, or the potential for interaction and interrelationship, of the child with any person who resides in, is present, or frequents the household of a parent and who may significantly affect the child's best interests. The court shall consider that person's history of inflicting, or tendency to inflict, physical harm, bodily injury, assault, or the fear of physical harm, bodily injury, or assault, on other persons.

l. The making of false allegations not made in good faith, by one parent against the other, of harm to a child as defined in section 50–25.1–02.

m. Any other factors considered by the court to be relevant to a particular child custody dispute.

[¶ 7] We exercise a limited review of a child custody award in divorce cases:

A trial court's custody determination is a finding of fact that will not be set aside on appeal unless it is clearly erroneous. A trial court's findings of fact are presumptively correct. The complaining party bears the burden of demonstrating on appeal that a finding of fact is clearly erroneous. In reviewing findings of fact, we must view the evidence in the light most favorable to the findings. A choice between two permissible views of the evidence is not clearly erroneous. Simply because we might view the evidence differently does not entitle us to reverse the trial court. A finding of fact is clearly erroneous only if the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.

*Reeves v. Chepulis,* 1999 ND 63, ¶ 8, 591 N.W.2d 791, quoting *Reimche v. Reimche,* 1997 ND 138, ¶ 12, 566 N.W.2d 790. "While split custody of siblings is generally disfavored, *McAdams v. McAdams,* 530 N.W.2d 647 (N.D.1995), we have affirmed it in some cases of half-siblings." *Ryan v. Flemming,* 533 N.W.2d 920, 924 (N.D. 1995). "It is especially appropriate that in close cases having to do with deciding custody of children between two fit parents that due regard be given to the trial court's opportunity to determine the credibility of the witnesses." *Dinius v. Dinius,* 448 N.W.2d 210, 214 (N.D.1989). Established patterns of care and nurture are relevant factors for consideration in deciding custody. *Heggen v. Heggen,* 452 N.W.2d 96, 101 (N.D.1990). "An award of custody is a finding of fact, and this Court will not disturb a custody award unless it is clearly erroneous." *Brown v. Brown,* 1999 ND 199, ¶ 10, 600 N.W.2d 869.

[¶ 8] In considering the thirteen factors specified by N.D.C.C. § 14–09–06.2(1), the trial court found one—factor a—favored Kyle, and found seven—factors b, c, g, h, i, j, and l—favored neither of the parties. With regard to the other five factors, the court found:

D. KayLee has lived on the farm all of her life. Her father is a farmer/rancher. Certainly there are risks and dangers on a farm/ranch. Good common sense and an appreciation of the risks and dangers is necessary in order to be safe on a farm or ranch. KayLee did suffer some bumps, bruises and a burn while she was in her father's

custody on the farm. KayLee was also injured while she was in her mother's custody in Braddock. While in Braddock, Kaylee fell off her bike and was injured. And she burned her foot on a lawnmower which was being operated by her half-brother. Prior to the parties' separation, the farm was a good, stable and satisfactory environment in which to raise a child. Just because one of the parties has chosen to leave the farm does not suddenly turn the farm into an unsatisfactory and dangerous place in which to raise a child. Mr. Stoppler understands the risks and dangers on the farm. He has been a farmer/rancher all his life. There is no credible evidence to show that Mr. Stoppler would place his daughter in some kind of jeopardy on the farm.

This factor favors the Plaintiff.

E. During the interim period, the Defendant along with her two sons from a prior marriage, live with Doreen Esperum, the mother of the Defendant, in Doreen's small house in Braddock. After the divorce, the Defendant plans to move to Bismarck where she is currently working for U.S. Health Care. The Defendant, along with her two sons, form a family unit. She hopes to add KayLee to the family unit. Possibly, the Defendant will add Keith Hagen, her boyfriend to the family unit. Since the Defendant plans on moving out of her mother's house, she is not able to inform the court about a custodial home. The Plaintiff lives on the farm and his plan is to stay on the farm. He hopes that the farm will continue to be KayLee's custodial home.

This factor favors the Plaintiff because the farm has always been Kay-Lee's permanent home.

F. The Defendant in her post trial brief stated, "Kyle did admit to having an affair with Keith Hagen prior to the parties' separation." Her adulterous relationship with Keith Hagen is ongoing. Her sexual misconduct with Mr. Hagen continues. She has not attempted to shield her children from her relationship with Mr. Hagen. Mr. Hagen even stays with the Defendant at the Defendant's mother's house. He interacts with her sons. KayLee even knows her mother is seeing another man, who is not her father. Now days, we tend to believe that what any two consenting adults do together is okay. But the plain fact is that this sexual misconduct by the Defendant and Mr. Hagen is simply immoral. Vern Zander, discovered the Defendant in a compromising position with a male motel patron in the hot tub of the Willows Motel. Mr. Zander was employed at the Willows Motel at the time. The Defendant contends that the male patron forced himself upon her. I do not believe her version of the story. She did not explain to or seek any help from Mr. Zander when she was discovered. She just left and went home.

This factor weighs heavily in favor of the Plaintiff.

. . . .

K. Defendant is in a relationship with Keith Hagen. Mr. Hagen is a soft-spoken person who has been convicted three times of driving while under the influence, and has been diagnosed as an alcoholic. Notwithstanding the diagnosis, Mr. Hagen does not believe he is an alcoholic and continues to drink alcohol. He testified that he drinks very seldom, once a month and drinks, two, three, four beers, maybe. He has completed outpatient treatment and aftercare, and he does attend AA. There was some testimony from Mr. Hagen's former girlfriend, Kasey Reich, that Mr. Hagen told her that he had to take classes for

anger management. Mr. Hagen testified that he has no assault convictions or ever been violent with women. Other than Ms. Reich's uncorroborated testimony, there is no evidence to show that Mr. Hagen has been convicted of assault or ever been violent with women. Mr. Hagen also testified that he plans on living with the Defendant when things are settled and calmed down. So, he definitely plans on having a relationship with the Defendant and her children in the future. Considering the potential for interaction and interrelationship of KayLee with Mr. Hagen, it would not be in the best interest of KayLee to reside in the same household with a person who has been convicted three times of DUI, been diagnosed as an alcoholic and despite treatment, continues to consume alcohol.

This factor weighs heavily in the Plaintiff's favor.

. . . .

M. In this case, there has been some badmouthing of the Defendant by the Plaintiff in front of KayLee. According to Anne Summers report, KayLee has told her father to stop saying bad things about her mom. And, according to Ms. Summer's report, the Plaintiff is making an effort to stop badmouthing the Defendant. After considering all the factors, custody of KayLee will be awarded to the Plaintiff. Overall, Mr. Stoppler has been a good father. He loves his daughter. Financially, he has the ability to care for her. Also, he has the ability to care for KayLee's personal needs. KayLee can continue to be raised on the family farm in the family home. Ms. Stoppler is temporarily living with her mother in her mother's small crowded home. She does not have a custodial home. Her continuous adulterous affair with a diagnosed alcoholic who continues to use alcohol is very troubling for the

Court. Mr. Hagen plans on living with the Defendant.

It would not be in KayLee's best interest to award custody to the Defendant.

 [¶ 9] Most of the factors listed in N.D.C.C. § 14–09–06.2(1) are relatively clear. As the Michigan Supreme Court has recognized, however, factors d and e "are phrased somewhat awkwardly." *Ireland v. Smith*, 451 Mich. 457, 547 N.W.2d 686, 690 (1996).

> Factor d calls for a factual inquiry (how long has the child been in a stable, satisfactory environment?) and then states a value ("the desirability of maintaining continuity"). Taken literally, factor e appears to direct an inquiry into the extent to which a "home" will serve as a permanent "family unit."

*Id.* at n. 8. Essentially, factor d addresses past stability of environment, including a consideration of place or physical setting, as well as a consideration of the prior family unit and its lifestyle as part of that setting. It also addresses the quality of that past environment, and the desirability of maintaining continuity. Under factor d, "prior custody is a factor to be considered when determining the custodial arrangement which is best for the child." 2 Sandra Morgan Little, *Child Custody & Visitation Law & Practice* § 10.09[2] (2001). Factor e, on the other hand, deals with future prospects for permanence as a family unit. While "there clearly is a degree of overlap between" factors d and e, "the focus of factor e is the child's prospects for a stable family environment." *Ireland*, 547 N.W.2d at 690. The court noted ways in which stability may be undermined:

> The stability of a child's home can be undermined in various ways. This might include frequent moves to unfamiliar settings, a succession of persons

residing in the home, live-in romantic companions for the custodial parent, or other potential disruptions. Of course, every situation needs to be examined individually.

*Id.* at n. 9.[1] In considering factor e, the trial court must weigh all the facts bearing on which parent can best provide their child "the benefits of a custodial home that is marked by permanence, as a family unit." *Id.* at 691.

[¶ 10] The trial court's analysis of factor d was appropriate. In its finding it considered the farm not merely as a location, but as a way of life that is a significant part of the environment in which KayLee has lived. The trial court also examined and weighed the risks inherent in that way of life, an issue raised by Kyle, as well as the protections from risk Bradley's experience as a farmer-rancher can provide. It is clear the trial court found KayLee has lived in a stable satisfactory environment, an environment which in part included the many elements of life on the farm, and it is clear the trial court further found maintaining the continuity of that environment is desirable.

[¶ 11] The trial court's analysis of factor e is a bit more troublesome. The first several sentences of the court's findings regarding factor e clearly address the nature of the family unit of Kyle's proposed custodial home and the likely relative permanence of that family unit, just as the factor contemplates. The last two sentences, however, speak to place, or perhaps environment, rather than family unit. Nothing in the paragraph appears to examine the family unit of Bradley's proposed custodial home. Rather, the trial court seems to compare the likely relative permanence of the family unit of Kyle's proposed custodial home with the continuity of the environment of Bradley's proposed custodial home, an analysis which seems to mix factors d and e.

[¶ 12] Nevertheless, as we have noted, there is a degree of overlap between factors d and e. While the finding regarding factor e may seem logically inconsistent, when we consider the trial court's analyses of factors d and e together with its analyses of factors f, k and m, it is clear the court believed and found KayLee's future prospects for a stable family environment with a more permanent family unit were greater in Bradley's custody. Considering the evidence in a light most favorable to the trial court's findings of fact, which are presumed correct, we conclude the trial court's custody award is not clearly erroneous.

## II

[¶ 13] Kyle contends the trial "court's award of only alternating weekend visitation with no additional evenings in between is insufficient to meet KayLee's needs and is clearly erroneous."

[¶ 14] Section 14–05–22(2), N.D.C.C., provides:

After making an award of custody, the court shall, upon request of the noncustodial parent, grant such rights of visitation as will enable the child and the noncustodial parent to maintain a parent-child relationship that will be beneficial to the child, unless the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health.

The primary purpose of visitation is to promote the best interests of the children, not the wishes of the parents. *Schiff v. Schiff,* 2000 ND 113, ¶ 9, 611 N.W.2d 191;

---

1. We have recognized frequent moving is evidence of a parent's inability to provide a stable environment for a child. *In re D.F.G.,* 1999 ND 216, ¶ 16, 602 N.W.2d 697.

*Ackerman v. Ackerman,* 1999 ND 135, ¶ 13, 596 N.W.2d 332. "Visitation with the noncustodial parent is presumed to be in the child's best interests and is not merely a privilege of the noncustodial parent, but a right of the child." *Schiff,* at ¶ 9. A trial court's determination on visitation is treated as a finding of fact, which we will affirm unless it is clearly erroneous. *Zuger v. Zuger,* 1997 ND 97, ¶ 36, 563 N.W.2d 804; *Reinecke v. Griffeth,* 533 N.W.2d 695, 698 (N.D.1995).

[¶ 15] "Nothing prevents these families from voluntarily adjusting their differences in a spirit of compromise and cooperation to accomplish the best interests of all." *Peterson v. Peterson,* 1997 ND 14, ¶ 28, 559 N.W.2d 826. If the parties are unable to adjust their visitation differences, after KayLee and her parents have exercised visitation in accordance with the provisions in the judgment for a time sufficient to afford KayLee an opportunity to forge closer ties with the custodial parent required by the divorce, the visitation issue can be addressed again. *E.g., Iverson v. Iverson,* 535 N.W.2d 739, 742 (N.D.1995) ("A trial court's decision on modification of visitation is a finding of fact which will not be reversed unless clearly erroneous.").

[¶ 16] While we might have provided different visitation provisions had we tried the case, we conclude the trial court's visitation determination is not clearly erroneous.

### III

[¶ 17] Kyle contends the trial court's property division is clearly erroneous. Under N.D.C.C. § 14–05–24, "[w]hen a divorce is granted, the court shall make such equitable distribution of the real and personal property of the parties as may seem just and proper." "While there is no set rule for distributing property, certain guidelines have been established for trial courts in *Ruff v. Ruff,* 78 N.D. 775, 52 N.W.2d 107 (1952), and *Fischer v. Fischer,* 139 N.W.2d 845 (N.D.1966)." *VanRosendale v. VanRosendale,* 333 N.W.2d 790, 791 (N.D.1983). "Although property division need not be equal to be equitable, the trial court must explain any substantial disparity." *Northrop v. Northrop,* 2001 ND 31, ¶ 8, 622 N.W.2d 219. "A trial court's determinations regarding division of marital property are treated as findings of fact that will not be reversed on appeal unless clearly erroneous." *Id.*

[¶ 18] "In order to make an equitable distribution, the trial court must first determine the net worth of the parties' property." *Freed v. Freed,* 454 N.W.2d 516, 520 (N.D.1990). "To review a property division, we need to understand the reasons for the trial court's decision." *Pfliger v. Pfliger,* 461 N.W.2d 432, 436 (N.D.1990). The trial court must indicate a rationale for its distribution of the property. *Northrop,* 2001 ND 31, ¶ 10, 622 N.W.2d 219. "A factual basis is necessary for a reviewing court to understand whether a trial court's distribution of marital property is clearly erroneous." *Hoverson v. Hoverson,* 2001 ND 124, ¶ 27, 629 N.W.2d 573. "When the trial court fails to fully explain a property division, we will not upset it if the reasons are fairly discernible by deduction or inference." *Pfliger,* at 436. "If the trial court fails to articulate an adequate factual basis for its property division or we are unable to determine its rationale through inference or deduction, we will remand for clarification of missing or conclusory findings." *Northrop,* at ¶ 10.

[¶ 19] The trial court made the following property division in its September 26, 2000, amended findings of fact, conclusions of law, and order for judgment:

5. *PROPERTY DIVISION:* After full consideration of the Ruff–Fischer Guidelines, the Court has determined a fair and equitable division of the parties' property and debts to be as follows:

Taking into consideration the fact that *Plaintiff* was a farmer/rancher prior to the marriage and that his income is totally dependent on the farming and ranching operation, he shall be awarded all livestock, feed and grain growing or on hand, all vehicles in his possession, his personal property in his possession, personal property he has acquired since the parties' separation, his savings and checking accounts, all his debts, all debts he has incurred since the parties' separation, all farming/ranching debts, and his insurance.

Taking into account that the *Defendant's* income is not dependent upon the farming and ranching operation and the fact of the Defendant's continuous adultery, she shall be awarded items on Defendant's Exhibit G which include the following: all household goods in her possession, her household goods in the spare house, T.V., Twin size bed, Kitchen chairs, couch, chair, dishes/pots/pans, three dressers, freezer, lamp and entertainment center; all personal property in her possession, her vehicle and debt; her checking and savings accounts, personal property she has acquired since the parties' separation, all her debts, all debts she incurred since the parties' separation, any retirement or pension assets, and any insurance she may have obtained. To assist Defendant in getting back on her feet, she will be awarded a payment of $10,000.00 from Plaintiff. Payment is to be made within 60 days of the date of the Judgment.

[¶ 20] There were disputes about the value of commodities, cows, and debt owed to Bradley's father. The trial court did not make findings determining the value of assets or debts, and did not make a finding determining the net worth of the parties' marital property. We are unable to discern what was awarded to the parties or its value, and are, therefore, unable to provide any meaningful review of the trial court's property distribution. We conclude the property distribution must be vacated and remanded for redetermination and the preparation of more complete findings.

## IV

[¶ 21] Kyle contends the trial court's failure to award her spousal support is clearly erroneous. Under N.D.C.C. § 14–05–24, the trial court "may compel either of the parties ... to make such suitable allowances to the other party for support during life or for a shorter period as to the court may seem just, having regard to the circumstances of the parties respectively." Spousal support determinations are treated as findings of fact that will not be reversed on appeal unless clearly erroneous. *Nelson v. Nelson,* 1998 ND 176, ¶ 9, 584 N.W.2d 527; *Zuger v. Zuger,* 1997 ND 97, ¶ 17, 563 N.W.2d 804. A court cannot consider property division and spousal support separately in a vacuum, but must examine those issues together. *Ketelsen v. Ketelsen,* 1999 ND 148, ¶ 6, 598 N.W.2d 185. The trial court may reconsider the issue of spousal support when it redetermines the property distribution and prepares more complete findings on remand.

## V

[¶ 22] The property distribution and spousal support provisions of the judgment are reversed and remanded for further proceedings in accordance with this opinion. The judgment is otherwise affirmed.

[¶ 23]GERALD W. VANDEWALLE, C.J., and DALE V. SANDSTROM, CAROL RONNING KAPSNER, JJ., concur.

MARING, Justice, concurring in part and dissenting in part.

[¶ 24] I concur in Parts II, III, and IV of the majority opinion. However, I am of the opinion that the trial court's findings of fact and conclusions of law regarding the child custody determination were induced by an erroneous application of factors (d) and (f) of N.D.C.C. § 14–09–06.2. Therefore, I respectfully dissent from Part I.

[¶ 25] The trial court found factor (a) of N.D.C.C. § 14–09–06.2, the love, affection, and other emotional ties existing between the parents and child, to favor awarding custody to Kyle. In making this finding, the trial court stated:

> Both parents love and show affection for their child, KayLee Stoppler, who was born on July 5, 1993. However, the emotional ties existing between KayLee and her mother appear to be stronger at this time than those existing between KayLee and her father.
>
> Anne Summers, the Guardian Ad Litem, pointed out in her report that KayLee is much more comfortable being with her mom and that KayLee's everyday and emotional needs of her life are met by her mom.
>
> Donna Zander, a friend of the Stopplers, testified that the Defendant was primarily responsible for the care of KayLee and that KayLee usually went to the Defendant for help. Susan Herzog, a social worker with West Central Human Service Center, has been counseling KayLee concerning the current family situation. According to Ms. Herzog, KayLee was worried about not being able to live with her mom.

As is evident from this finding, the trial court found a strong relationship existed between KayLee and Kyle. However, the trial court failed to address the impact of this relationship on the stability of KayLee's environment and the desirability of the continuity of this relationship after the divorce. Therefore, it is my opinion that the trial court incorrectly applied factor (d) of N.D.C.C. § 14–09–06.2.

[¶ 26] When applying factor (d), a trial court must examine "[t]he length of time the child has lived in a stable satisfactory environment and the desirability of maintaining continuity." N.D.C.C. § 14–09–06.2(d). The majority correctly states that "factor d addresses past stability of environment, including a consideration of place or physical setting, as well as a consideration of the prior family unit and its lifestyle as part of that setting." However, the majority fails to recognize that the trial court did not consider how the dynamics of the "prior family unit" affected the past stability of KayLee's environment. The treatise cited by the majority in its discussion of factor (d) recognizes the importance that maintaining the child's accustomed relationships plays in the stability of the child's environment. *See* Sandra Morgan Little, *Child Custody & Visitation Law & Practice* § 10.09[1] (2001) ("Important considerations include maintaining continuity and stability in the child's life, especially in the child's relationships with parents, siblings and others.").

[¶ 27] In this case, the trial court did not consider how the relationships between KayLee and Kyle and between KayLee and her half siblings affected the past stability of her environment. Furthermore, the trial court never addressed the "desirability of maintaining continuity" of these relationships after the divorce. Instead, the trial court merely considered the past

physical setting, i.e., the farm, and the dangers inherent in that setting.

[¶ 28] In the context of an original custody determination, we have said, "[w]hile community stability is a consideration, it is not overriding. It can be outweighed by factors favoring a residence elsewhere. Continuity in a child's relationship with the closest, nurturing parent is also a very important aspect of stability." *Roen v. Roen*, 438 N.W.2d 170, 174 (N.D.1989) (citation omitted); *accord Schmaltz v. Schmaltz*, 1998 ND 212, ¶ 10, 586 N.W.2d 852 (affirming an award of custody to a father who planned to move the children from the town they had lived in for nine years). Furthermore, it is proper for trial courts to address "the importance of stability and continuity in the lives of the children and the benefits to the children from continuing the children's relationship with the parent who had cared for them on a daily basis." *See Heggen v. Heggen*, 452 N.W.2d 96, 101 (N.D.1990). We have repeatedly recognized that the importance of continuing this relationship is properly addressed under factor (d) of N.D.C.C. § 14–09–06.2. *See Kjelland v. Kjelland*, 2000 ND 86, ¶ 10, 609 N.W.2d 100 ("Under factors (d) and (e), the trial court acknowledged Tom's greater stability and commitment to parenting. A party's commitment to parenting is a valid factor to consider in determining custody."); *Foreng v. Foreng*, 509 N.W.2d 38, 40 (N.D.1993) (listing factors (a), (b), (d), and (e) as factors that "bear upon the parties' parenting ability, emotional disposition and relationship with the child"); *Swanston v. Swanston*, 502 N.W.2d 506, 509 (N.D.1993) ("The trial court considered favorably the stability and continuity of the children's relationship with Curtis, [the father,] and the benefits that would flow from continuing that relationship. 'Established patterns of care and nurture are relevant factors for the trial court to have considered.' "). In this case, the trial court erred in its application of factor (d) when it made no inquiry into the benefits that KayLee would receive from continuing her relationship with Kyle, the parent who had cared for her on a daily basis.

[¶ 29] In addition to the original custody determination cases discussed above, our modification of custody cases also illustrate the important role that a child's relationship with the nurturing parent plays in the stability of the child's environment. In *Orke v. Olson*, 411 N.W.2d 97, 101 (N.D. 1987), we held that the trial court erred in changing custody from the mother to the father. In doing so, we emphasized that the important aspect of "stability" is "the stability of the child's relationship with the custodial parent." *Id.* at 100. We further emphasized that, "[i]t is that continuous and uninterrupted relationship that has been important to the child since the divorce." *Id.* at 100–101; *accord Blotske v. Leidholm*, 487 N.W.2d 607, 611 (N.D.1992) ("It is the continuity of the custodial parent-child relationship that is critical, not the continuity of the stepparent-child relationship."). We have also stressed the importance of maintaining the continuity of that relationship over the importance of maintaining continuity of the child's physical setting. For example, in *Klose v. Klose*, 524 N.W.2d 94, 96 (N.D.1994), the ex-husband brought a motion for change of custody after the ex-wife moved from Jamestown to Bismarck with the children. In support of his motion, the husband argued the children expressed a preference to stay in Jamestown with him. *See id.* In rejecting this argument we stated, "a child's preference to remain in a community where his friends and familiar surroundings are located is predictable but generally should not override the important need for the child to maintain a stable relationship with the custodial parent." *Id.* at 97.

Likewise, in the present case, while the trial court could consider KayLee's prior physical setting, it erred by failing to weigh this consideration against the importance of maintaining continuity in Kay-Lee's relationship with Kyle.

[¶ 30] Interpreting factor (d) to encompass continuity of a child's prior parental relationships is not only in accordance with our prior cases, but also, is in accordance with interpretations given to identical factors by other state courts. As is evident from the majority's citation of *Ireland v. Smith*, 451 Mich. 457, 547 N.W.2d 686, 690 (1996), Michigan law provides for a factor identical to factor (d) of N.D.C.C. § 14–09–06.2. *See* Mich. Comp. Laws Ann. § 722.23(d) (West Supp.2001). However, it was factor (e), the permanence of the proposed family home, that was at issue in *Ireland,* not factor (d). *See Ireland,* 547 N.W.2d at 689–90. In a recent case, a Michigan Court of Appeals did have the opportunity to directly address the application of section 722.23(d). *See Phillips v. Jordan,* 241 Mich.App. 17, 614 N.W.2d 183, 189 (2000). In doing so, it recognized the importance of continuity of the parent-child relationship over continuity of the child's physical setting. *See id.* (affirming the trial court's finding that, while the plaintiff, the child's custodial parent, had frequently changed residences, "the child's home was with plaintiff wherever that may be and that parents could not be punished for having to move").

[¶ 31] Like Michigan, Alaska law also provides for a factor identical to factor (d) of N.D.C.C. § 14–09–06.2. *See* Alaska Stat. § 25.24.150(c)(5) (Michie 2000). The Alaska Supreme Court has noted that "the criteria of stability and continuity must be considered in light of the facts of each particular case." *McQuade v. McQuade,* 901 P.2d 421, 426 (Alaska 1995). Thus, in addressing stability and continuity, a trial court can consider the child's prior physical setting if the facts of the case warrant such consideration. *See, e.g., Evans v. Evans,* 869 P.2d 478, 482 (Alaska 1994); *Craig v. McBride,* 639 P.2d 303, 305 (Alaska 1982). However, under this factor, trial courts "*must* consider each parent's respective ability to maintain stable and satisfactory relations between themselves and the child following separation." *McQuade,* 901 P.2d at 426 (emphasis added). Therefore, "the fact that the physical location of a child's home changes may have little or no bearing on the stability of the home." *Craig,* 639 P.2d at 308 (Rabinowitz, C.J., concurring).

> Continuity and stability for a child come not only from staying in the same house, or going to the same school. Consideration should also be given to social and emotional factors such as who the primary care-giver was for the child and whether the child would be separated from siblings or family members if he was placed with one parent rather than the other.

*Rooney v. Rooney,* 914 P.2d 212, 217 (Alaska 1996). Under factor (d), "[s]tability is often a function of parental attitude and not of geography." *Craig,* 639 P.2d at 308 (Rabinowitz, C.J., concurring).

[¶ 32] In addition to erring in applying factor (d), the trial court also erred in its application of factor (f) of N.D.C.C. § 14–09–06.2. In determining the best interests of a child, factor (f) allows a trial court to examine "[t]he moral fitness of the parents." N.D.C.C. § 14–09–06.2(f). Our recent cases have indicated that an extramarital affair or adulterous relationship should be given little, if any, weight under this factor unless there is evidence that the affair had an adverse effect on the children. In *Foreng,* we affirmed an award of custody to a mother who had an extramarital relationship where the trial court

found that the affair did not have a detrimental impact on the children. 509 N.W.2d at 40. In doing so, we refused to adopt the suggestion "that evidence of extramarital relationships, per se, is an irrefutable indication of moral unfitness." *Id.* Likewise, in *Gregg v. Gregg*, we affirmed a trial court's finding that an extramarital affair by the mother was not relevant to moral fitness because the children were not affected by it. 1998 ND 204, ¶ 10, 586 N.W.2d 312; *see also Schmaltz*, 1998 ND 212, ¶ 8, 586 N.W.2d 852 (affirming an award of custody to a father who had an affair after the parties separated but before they were divorced).

[¶ 33] Like factor (d) of N.D.C.C. § 14–09–06.2, factor (f) also has a virtually identical counterpart under Michigan law. *See* Mich. Comp. Laws Ann. § 722.23(f) (West Supp.2001). In interpreting factor (f), the Michigan Supreme Court stated that the critical words of this factor are "fitness of the parties involved." *See Fletcher v. Fletcher*, 447 Mich. 871, 526 N.W.2d 889, 896 (1994).

> Factor f (moral fitness), like all the other statutory factors, relates to a person's fitness as a parent. To evaluate parental fitness, courts must look to the parent-child relationship and the effect that the conduct at issue will have on that relationship. Thus, the question under factor f is not 'who is the morally superior adult;' the question concerns the parties' relative fitness to provide for their child, given the moral disposition of each party as demonstrated by individual conduct.

*Id.* Thus, the court held that "questionable conduct is relevant to factor f only if it is a type of conduct that necessarily has a significant influence on how one will function *as a parent.*" *Id.* (footnote omitted). In reaching this holding, the court reasoned, "to punish infidelity at the risk of jeopard-

izing a child's best interests simply contravenes the overriding purpose of the Child Custody Act." *Id.*

> Extramarital relations are not necessarily a reliable indicator of how one will function within the parent-child relationship. While such conduct certainly has a bearing on one's spousal fitness, it need not be probative of how one will interact or raise a child. Because of its limited probative value and the significant potential for prejudicially ascribing disproportionate weight to that fact, extramarital conduct, in and of itself, may not be relevant to factor f.

*Id.* (footnote omitted). Michigan courts have extended this reasoning to apply to unmarried cohabitation, as well as extramarital affairs. *See Hilliard v. Schmidt*, 231 Mich.App. 316, 586 N.W.2d 263, 267 (1998) (citing *Fletcher*, 526 N.W.2d at 896); *see also Truitt v. Truitt*, 172 Mich.App. 38, 431 N.W.2d 454, 458 (1988) ("Standing alone, unmarried cohabitation is not enough to constitute immorality under the Child Custody Act.").

[¶ 34] In this case, in applying factor (f), the trial court made no finding that Kyle's cohabitation with her boyfriend had an adverse effect on KayLee. In fact, the only reference the trial court made to KayLee under factor (f) is the statement "KayLee even knows her mother is seeing another man, who is not her father." Nowhere did the trial court explain how this conduct related to how Kyle will function as a parent. Rather, the trial court wrongfully presumed that Kyle's cohabitation with her boyfriend indicated moral unfitness under factor (f). *See Foreng*, 509 N.W.2d at 40 (refusing to adopt the position "that evidence of extramarital relationships, per se, is an irrefutable indication of moral unfitness").

[¶ 35] Because I believe the trial court misapplied factors (d) and (f) of N.D.C.C.

§ 14-09-06.2, I respectfully dissent and would remand for a correct application of the law.

[¶ 36] Mary Muehlen Maring, J.