2002 ND 126

**John Robert BEAULAC, Plaintiff and Appellant,**

v.

**Donna Gail BEAULAC, Defendant and Appellee.**

No. 20010316.

Supreme Court of North Dakota.

Aug. 15, 2002.

Lynn M. Boughey, Boughey Law Firm, Minot, for plaintiff and appellant.

Richard L. Hagar, Kenner Sturdevant Peterson & Cresap, PC, Minot, for defendant and appellee.

KAPSNER, Justice.

[¶ 1] John BeauLac appealed from a December 12, 2001, order denying his motion requesting the court to hold his former spouse, Donna BeauLac, in contempt of court. He also appealed from a December 19, 2001, amended judgment awarding custody of the parties' daughter to him and the parties' son to Donna BeauLac. We hold the trial court's custody award is not clearly erroneous, and the court did not abuse its discretion in refusing to hold Donna BeauLac in contempt of court. We, therefore, affirm the court's order and amended judgment.

I

[¶ 2] John and Donna BeauLac were married in June 1978. They had two children: a daughter, born in 1988, and a son, born in 1991. Irreconcilable differences developed in the marriage and the parties were divorced in October 1998. Under the original divorce decree Donna received custody of both children.

[¶ 3] Problems developed in the relationship between Donna and her daughter. Donna explained, "I think [my daughter] has a lot of anger for some reason. For some reason she feels that perhaps I am to blame for the divorce, or some reason she has resentment towards me. There are moments that we have had together when she has shown closeness, but it's very reserved." On several occasions, the daughter attempted to run away from Donna's home in Minot to stay with John, who was also living in Minot.

[¶ 4] In May 2000, John moved for custody of the children. There was never a hearing on this motion. Instead, the parties stipulated John would receive full-time extended visitation with their daughter for the entire 2000–2001 school year, from August 30, 2000, to May 25, 2001. When asked if the stipulation was her idea, Donna responded:

Yes it was. We—I came up with that because of the difficulty with her running away and accusing me of abuse and not willing to cooperate with me when I had guidelines and rules and things set before her to do, and my parenting with her was becoming more and more difficult, and her stance was still that she wanted to live with her dad, and so I thought for a period we might see what it would—how it would do, how it would affect her grades, and I understood that if she did well in school it was a very clear possibility she would end up living with her dad.

Based upon the parties' stipulation, the trial court entered an order on November 29, 2000, placing the daughter in John's custody until May 25, 2001, leaving the son in Donna's custody, and setting a visitation schedule for the non-custodial parent of each child, including alternating weekend visitations and specified holiday visitations.

[¶ 5] On May 2, 2001, John moved for permanent custody of both children. After a hearing on May 17, 2001, the trial court ruled from the bench:

I guess one of the concerns I have here, after listening and reading the file again, of the way that [the daughter] has learned to take advantage of these two parents. She knows they are vulnerable, she knows they don't like each other, she knows she can play one against the other, and she is probably pretty good at that, and I am concerned that [the son] is going to be learning these same tricks, and gonna be doing that same stuff . . . .

As far as [the son's] statements about being the man of the house, etcetera, they could be an indication of the—what is it you called it—parentification. They could also be a way to soften the blow to dad to say why I want to live with mom, and I'll have some excuses to why I don't want to make dad unhappy either. Because he obviously loves both his parents . . . .

Normally I would keep siblings together, but I am not going to in this case. I believe that there has been a significant change of circumstances that necessitates change of custody for [the daughter], and the motion is granted and the father is granted custody. But I don't find that same thing with [the son]. The burden is pretty heavy. Change of circumstances necessitating change in custody. No, that's—it's not necessary at this point. He is doing fine, and I think he will continue to do so.

[¶ 6] On November 16, 2001, John filed three separate motions, requesting the court to reconsider its refusal to award him custody of his son, to develop a structured visitation schedule for the parties, and to hold Donna in contempt of court "for selling [the daughter's] horse in contradiction of the Court's verbal directives of May 17, 2001." On November 28, 2001, a hearing was held on these motions.

[¶ 7] On December 12, 2001, the court entered an order, based upon the May 17, 2001, hearing, awarding John custody of his daughter, denying John's motion for custody of his son, and ordering the parties to either set a visitation schedule or return to the court for resolution of the visitation issue. The court entered a second order on December 12, 2001, denying John's motion to hold Donna in contempt for selling the daughter's horse, denying John's motion for reconsideration of the court's refusal to award John custody of his son, and granting John's motion for structured visitation. On December 19, 2001, the court entered an amended judgment awarding John custody of his daughter, awarding Donna custody of her son, and setting structured visitation for the parties. John appealed.

## II

[¶ 8] John asserts the trial court erred in refusing to find Donna in contempt of court for selling the horse. At the close of the May 17, 2001, hearing, after the trial judge announced the court was going to award John custody of his daughter, John's attorney informed the court that the daughter owned a horse and would like to "work with it this summer." A discussion ensued, wherein Donna told the court she had boarded the horse with a person living near Granville and there were outstanding boarding fees. The court asked Donna if she had any objection "to [John] taking over the boarding fees?" She responded, "[i]f he wants to pay them." John's attorney then commented, "I don't know why he should pay the boarding fees that she has been not paying." The court expressed frustration that the parties had raised this issue after the hearing was concluded and without presenting any testimony on it. The discussion continued:

THE COURT: The bills are gonna be yours, you are the one that's been boarding it there. I assume he doesn't have any contract there, so you are probably going to get stuck with those, but—I don't know. It seems to me that the horse should go with the child unless you disagree that it's her horse.

MS. BEAULAC: I disagree. It's not really her horse, but I'm not going to pick.

THE COURT: Okay. The horse—I guess you got the horse.

MR. BOUGHEY: Thank you, your Honor. We have nothing else.

THE COURT: And whatever goes with it.

MR. HAGAR: Your Honor, if the gentleman doesn't release the horse because of the bills, are you requiring then that my client has to pay the bills in order to get the horse released?

THE COURT: I am not doing anything with that.

MR. HAGAR: I didn't think so, your Honor, that's why I just thought I would ask.

THE COURT: I can't order him to do anything. If he has got a lien on the horse, he has got a lien on the horse.

[¶ 9] Shortly after the hearing, Donna wrote the person who was boarding the horse and authorized him to sell the horse to pay for the outstanding boarding fees. When John discovered the horse had been sold, he filed a motion requesting the court to hold Donna in contempt. At the November 28, 2001, hearing, the court explained:

THE COURT: Let's—let's stop with the horse. As far as I am concerned, [Donna's] interpretation of what happened is exactly my interpretation of what happened. At the end of a case, without hearing any evidence one way or the other both counsel sprung a new decision on me that gave me no evidence to make [sic], and everybody had an opinion on it, and I asked some questions to try [to] understand what was going on. I made some statements in an effort to try [to] broker a deal, but as far as I am concerned anything that I said regarding that horse is at best dicta, and I am not going to be finding anybody in contempt regarding the horse.

MR. BOUGHEY: Your Honor, I find that very unfortunate given the context.

THE COURT: Well, I understand what it says. I understand. I have read what you put in. I reread the transcript. I remember exactly the way I felt at the time, that I wanted to make no decision on that. I attempted to try [to] resolve that in the hopes that it could be resolved. I was unable to do so, and any decision I did make was made without proper foundation as far as evidence. I heard nothing about who paid for it, I heard nothing about—as far as testimony. I am not going to be finding her in contempt for violating anything on that.

Thereafter, the court entered its order denying John's motion to hold Donna in contempt for allowing the boarder to sell the horse.

[¶ 10] A prerequisite for finding a person in contempt of a prior court order is that the person had actual notice or knowledge of that order. *Bjorgen v. Kinsey*, 491 N.W.2d 389, 395 (N.D.1992). In *Flattum–Riemers v. Flattum–Riemers*, 1999 ND 146, ¶ 5, 598 N.W.2d 499, this Court explained the standards for proving civil contempt and for reviewing the lower court's decision:

In a civil contempt proceeding, a complainant must clearly and satisfactorily show that the alleged contempt has been

committed. Civil contempt requires a willful and inexcusable intent to violate a court order. When reviewing a contempt sentence, the ultimate determination of whether or not a contempt has been committed is within the trial court's sound discretion. A trial court's finding of contempt will not be overturned unless there is a clear abuse of discretion. An abuse of discretion occurs when the trial court acts in an arbitrary, unreasonable, or unconscionable manner or when it misinterprets or misapplies the law.

(Citations omitted.)

[¶ 11] In this case, the trial court clearly explained that although it tried to "broker a deal" among the parties regarding placement of the horse and payment of the boarding fees, the court did not issue an explicit order requiring Donna to return the horse to John or the daughter or forbidding Donna from having the horse sold to pay for boarding fees. Consequently, the trial court concluded Donna had not violated any order of the court and should not be held in contempt. Under these circumstances, we conclude the court did not abuse its discretion in denying John's motion to have Donna held in contempt of court.

### III

[¶ 12] John asserts the trial court's decision to award him custody of the daughter while allowing Donna to retain custody of their son is clearly erroneous. The party seeking modification bears the burden of showing a change of custody is required. *Selzler v. Selzler*, 2001 ND 138, ¶ 21, 631 N.W.2d 564. When a trial court entertains a motion to change custody it must determine two issues: (1) whether there has been a significant change in circumstances since the original divorce decree and custody award and, if

so, (2) whether a change in custody is necessary to foster the best interests of the child. *Kelly v. Kelly,* 2002 ND 37, ¶ 15, 640 N.W.2d 38. A trial court's decision to modify custody is a finding of fact subject to the clearly erroneous standard of review. *Id.* at ¶ 13. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.* It is especially appropriate in close cases involving custody of children between two fit parents that due regard be given to the trial court's opportunity to determine the credibility of the witnesses. *Stoppler v. Stoppler,* 2001 ND 148, ¶ 7, 633 N.W.2d 142.

### A

[¶ 13] John asserts the trial court should have awarded him custody of both children to avoid splitting custody of these siblings, resulting in them living in different households. The trial court found there was a significant change of circumstances since entry of the original decree necessitating a change of custody for the daughter. However, the court also found there had not been a significant change of circumstances to warrant a change of custody for the son.

[¶ 14] The parties do not dispute that a significant change of circumstances warranted a change of the daughter's custody from Donna to John. While the daughter was in Donna's custody, there was much tension and discord in their relationship. Donna testified she spent six months in counseling trying to resolve the problems in the relationship between them. The daughter's grades in school were poor and she attempted on more than one occasion to run away from home. Subsequently, the parents agreed that, in the daughter's

best interests, she should spend the 2000–2001 school year in John's custody. The evidence shows the agreement worked very well. The evidence shows the daughter is a happier child since moving into John's home and she is doing much better in school. She has many friends and is involved in extracurricular activities. Consequently, the parents agree with the trial court's determination that in the daughter's best interests she should remain in John's custody. However, circumstances are different with regard to the son.

[¶ 15] The record evidence shows that while the son lived in Minot some of the neighbor boys were very mean to him. He was not having an easy time in the neighborhood or at school. Early in 2001, Donna and her son moved to Bismarck where Donna accepted a new job with better career opportunities. The evidence shows the son has been doing much better in school since moving to Bismarck and he has made new friends. Donna testified she has a loving relationship with her son and living in Bismarck has gone "very well" for him. She testified he is involved in archery and soccer and that she and her son have had many opportunities for recreation, including roller blading and biking. The evidence establishes that the son has adjusted well to the Bismarck community and school system and that he likes living with his mother.

[¶ 16] As a general rule the courts do not look favorably upon separating siblings in custody cases. *Leppert v. Leppert,* 519 N.W.2d 287, 291 (N.D.1994). However, this Court has not prohibited the separation of children in all custody disputes and has, in fact, approved it where the trial court has found split custody desirable. *See Freed v. Freed,* 454 N.W.2d 516, 519 (N.D.1990). In *Loll v. Loll,* 1997 ND 51, ¶ 15, 561 N.W.2d 625, this Court concluded a trial court did not err in splitting

custody of twins, based upon the children's preferences and the fact that the boy displayed severe anxiety toward his mother and wanted to live with his father and the girl was adamant she be allowed to live with her mother. This case presents a similar situation.

[¶ 17] In making its custody award, the trial court has structured visitation, alternating between each parent's residence, so that both children will spend alternating weekends together. The evidence demonstrates the children have adjusted to their current living arrangements and appear to be satisfied with the opportunity they currently have for interaction and contact with each other.

[¶ 18] John and Donna recognized that it simply was not working for the daughter to live with Donna. Tension and anxiety between them was too great and the resulting commotion was not healthy for any of the family members, including the son. Since Donna and her son moved to Bismarck, he has adapted well to his surroundings, has developed friendships, and is doing very well in school. Under these circumstances, it does not appear to be in either child's best interests to upset their current living conditions merely to foster a general policy against split custody.

**B**

[¶ 19] John asserts the trial court erred in not finding a pattern of abuse by Donna against the daughter and in refusing to apply the statutory rebuttable presumption against Donna having custody of the son for having perpetrated domestic violence against her daughter. Section 14–09–06.2(1)(j), N.D.C.C., provides, in part:

> If the court finds credible evidence that domestic violence has occurred, and ... there exists a pattern of domestic violence within a reasonable time proxi-

mate to the proceeding, this combination creates a rebuttable presumption that a parent who has perpetrated domestic violence may not be awarded sole or joint custody of a child.

While John claims that Donna was abusive toward the daughter, Donna denies ever having struck or hit her. She admits that on one occasion the daughter was pulled onto the couch, apparently by Donna, and received a facial scratch. However, there is a dearth of evidence to show specific incidents or a pattern of domestic abuse or violence perpetrated by Donna. Although the trial court should make specific factual findings and conclusions regarding the presumption against custody for perpetrating domestic violence, specific findings are not required when there is insufficient evidence of domestic violence to trigger the presumption. *Tulintseff v. Jacobsen*, 2000 ND 147, ¶ 13, 615 N.W.2d 129. Although explicit findings regarding the application of N.D.C.C. § 14–09–06.2(1)(j), would have aided our review, we can reasonably infer from the record that the trial court considered the evidence of domestic violence and found it insignificant to trigger the statutory presumption.

### C

[¶ 20] John raises several other factors which he asserts weigh in his favor and demonstrate the trial court erred in not awarding him custody of his son. He asserts the son is being overly medicated for attention deficit syndrome, resulting in the son acting very sluggish and lacking energy. There is evidence that the son is taking Ritalin, or similar medication, only on school days, not on weekends and not during the summer. The evidence shows this medication has been prescribed by a doctor and the son is being monitored for dosage. There is evidence that since taking this medication the son is more attentive in school and is easier to control than when he was not taking the medication.

[¶ 21] John asserts he should be awarded custody of his son, because Donna has frustrated John's visitation with the son and has attempted to alienate the son from his father. We have recognized that evidence of alienation and frustration of visitation can be considered to determine whether a change of circumstances has occurred. *Hendrickson v. Hendrickson*, 1999 ND 37, ¶ 13, 590 N.W.2d 220. Further, a parent who persists in frustrating the visitation of the non-custodial parent risks losing custody as a result of such conduct. N.D.C.C. § 14–09–06.6(5)(a). *Hendrickson v. Hendrickson*, 2000 ND 1, ¶ 18, 603 N.W.2d 896. Donna testified that she will cooperate and make the son available for visits with John. She also testified that John's failure to have more visitations with his son was the result of John refusing to pick him up for visitation. The gist of the record evidence is that neither parent cooperates very well with the other and neither has made much effort to accommodate the other. Consequently, the trial court has now set forth a very structured visitation schedule with specific pick up and drop off times and locations. The court did not find Donna has alienated the son against John or that either party has been more to blame than the other for visitation failures.

[¶ 22] John asserts he should be awarded custody of his son, because Donna has caused "parentification" of the son by making him assume a head-of-the-household role rather than a child role. Donna testified about the son's role in their home:

> Q. Do you have any concerns in reference to [your son], that he is now taking over as being—to quote counsel—the man of the house?
>
> A. No.

Q. In reference to that, on an average week is [your son]—he obviously goes to school. When he is not in school does he do any chores around the house?

A. Yes.

Q. What type of chores does he do?

A. Cleans his room, which involves vacuuming the floor and picking up toys and putting away his dirty laundry. He cleans up his bathroom which involves cleaning the sink and the counter and picking up his towels and dirty clothes.

Q. Any other duties around the house that he does?

A. Picking up his dishes after meal time.

Q. And apparently mowing the lawn, I saw some reference to that?

A. Yes, he is encouraged—he is very excited about taking on that responsibility this summer.

Q. Any other responsibilities he is taking on besides those you have mentioned?

A. He takes out the garbage.

Q. How is [his] health?

A. Very good.

Donna also testified that her son has made new friends in Bismarck, that he participates in recreational activities, and that he is enrolled in extracurricular activities. We conclude the record evidence does not demonstrate that Donna has forced her son to assume an inappropriate adult-like role in their household.

IV

[¶ 23] We hold the trial court did not abuse its discretion in refusing to find Donna in contempt of court for disobeying a court order relating to the daughter's horse. We hold the trial court did not err in refusing to find sufficient evidence to establish a pattern of abuse by Donna for purposes of applying a presumption against her having custody of either child. We further hold the trial court's denial of John's request for a change of his son's custody is not clearly erroneous. We, therefore, affirm the court's order of December 12, 2001, and its amended judgment of December 19, 2001.

[¶ 24] GERALD W. VANDE WALLE, C.J., DALE V. SANDSTROM, and WILLIAM A. NEUMANN, JJ., concur.

MARING, Justice, concurring in the result.

[¶ 25] I agree with the majority opinion Parts II and IV, but I concur in the result only on the custody issue discussed in Part III. I continue to adhere to my opinion on the proper method for analyzing a motion to change custody as set forth in *Kelly v. Kelly*, 2002 ND 37, ¶ 52, 640 N.W.2d 38 (Maring, J., concurring in the result).

[¶ 26] MARY MUEHLEN MARING, J.