2012 ND 197

**Michael P. MARTIRÉ, Plaintiff, Appellant and Cross–Appellee,**

v.

**Sandra Hendricksen MARTIRÉ, Defendant, Appellee and Cross–Appellant.**

No. 20110197.

Supreme Court of North Dakota.

Sept. 25, 2012.

Rehearing Denied Oct. 23, 2012.

Rodney E. Pagel, Bismarck, N.D., for plaintiff, appellant and cross-appellee.

Richard Ducote (argued), Pittsburgh, Pa., and Irving B. Nodland (appeared), Bismarck, N.D., for defendant, appellee and cross-appellant.

Patricia E. Garrity, Guardian ad Litem, Bismarck, N.D.

KAPSNER, Justice.

[¶ 1] Michael Martiré appeals and Sandra Hendricksen Martiré cross-appeals from a divorce judgment and from the district court's orders on post-trial motions. Both parties challenge the court's decisions on primary residential responsibility, child support, spousal support and marital property distribution, as well as its disposition of the post-trial motions. We affirm, concluding the court's findings of fact are not clearly erroneous and the court did not abuse its discretion.

I

[¶ 2] The parties were married in 1990 and had three children: a daughter, D.M., born in 1992; a son, R.M., born in 1995; and another son, C.M., born in 2001. Martiré has a medical degree and is a physiatrist working at the Spine and Pain Center in Bismarck. Hendricksen Martiré has masters' degrees in business administration and speech pathology, and during the early years of the marriage worked as head of the geriatric department at a Bismarck hospital. In 1995 the parties agreed that Hendricksen Martiré would stay at home to care for the children and she worked primarily at home as the vice president and business manager for the clinic business. The parties accumulated significant assets during their marriage. Both parties have been diagnosed with mental disorders which had an effect on the children and eventually contributed to the breakup of the marriage.

[¶ 3] The parties separated in December 2007 and Martiré commenced this divorce action in January 2008. These divorce proceedings have been contentious and a nine-day divorce trial was held in February 2010. Martiré was 51 years old and Hendricksen Martiré was 48 years old at the time of trial. In a 56–page decision, the district court granted the divorce, awarded the parties joint primary residential responsibility for their sons, and awarded Hendricksen Martiré primary residential responsibility for their daughter. The court found Hendricksen Martiré has alienated the children from their father, but also found it would not be in the children's best interests to grant Martiré sole primary residential responsibility because his abnormal behavior before the parties separated contributed to the estrangement between him and the older children. The court ordered Martiré to pay $6,127 per month for child support. The court awarded Martiré $2,027,416 of the net marital assets and awarded Hendricksen Martiré $2,033,676 of the net marital assets. The court further awarded Hendricksen Martiré $5,000 per month for spousal support until she either dies, remarries or attains the age of 65, whichever occurs first.

[¶ 4] The parties filed numerous post-trial motions. Hendricksen Martiré filed an emergency motion for financial relief and sought to hold Martiré in contempt and requested sanctions. The court ordered Martiré to make a scheduled payment by a certain date to avoid being held in contempt and ordered him to pay Hendricksen Martiré $1,500 in attorney fees associated with her motion. Martiré moved for reconsideration of the court's order on Hendricksen Martiré's motion. Hendricksen Martiré filed motions to find Martiré in contempt and for appointment of a reunification therapist and for appointment of a new parenting coordinator. Martiré filed a motion to hold Hendricksen Martiré in contempt for failing to execute documents necessary to effectuate the divorce judgment. Hendricksen Martiré also sought relief from the divorce judgment under N.D.R.Civ.P. 52, 59 and 60, alleging 29 errors made by the court in its decision. The court, for the most part,

denied the motions and these appeals followed.

## II

[¶ 5] One thing the parties agree about in this case is that the major issue on appeal is whether the district court erred in granting them joint primary residential responsibility for their two sons. The daughter is now emancipated. Each party claims the court erred in failing to award him or her sole primary residential responsibility for the sons.

[¶ 6] This Court reviews an award of primary residential responsibility under the clearly erroneous standard of review, which does not allow us to reweigh the evidence, reassess the credibility of witnesses, or substitute our judgment for a district court's initial decision. *Smith v. Martinez*, 2011 ND 132, ¶ 3, 800 N.W.2d 304. A district court's decision awarding primary residential responsibility is a finding of fact which will not be reversed on appeal unless it is induced by an erroneous view of the law, if no evidence exists to support it, or if on the entire record we are left with a definite and firm conviction a mistake has been made. *Id.* A choice between two permissible views of the weight of the evidence is not clearly erroneous. *Duff v. Kearns–Duff*, 2010 ND 247, ¶ 5, 792 N.W.2d 916. A district court must consider the best interests of the child in awarding primary residential responsibility, and in doing so must consider all the relevant best-interest factors contained in N.D.C.C. § 14–09–06.2(1). *Duff*, at ¶ 5.

[¶ 7] Here, the district court found that both parents have the ability to assure the children receive adequate food, clothing, shelter, medical care, and a safe environment under N.D.C.C. § 14–09–06.2(1)(b), and that both parents were morally fit under N.D.C.C. § 14–09–06.2(1)(f). The court found although the two oldest children were of sufficient age and intelligence to express a preference under N.D.C.C. § 14–09–06.2(1)(i), it would not consider the preferences of the children because of "the influence of alienation by" Hendricksen Martiré. The court found no evidence of domestic violence or of false allegations of harm to the children under N.D.C.C. § 14–09–06.2(1)(j) and (*l*), and determined the factor addressing the interaction and interrelationship of the children with any person who resides in or frequents the home of a parent under N.D.C.C. § 14–09–06.2(*l*)(k) did not apply.

[¶ 8] Under N.D.C.C. § 14–09–06.2(1)(a), which addresses the "love, affection, and other emotional ties existing between the parents and child and the ability of each parent to provide the child with nurture, love, affection, and guidance," the district court found:

> The testimony and evidence at trial indicated that both parties love the children. However, Michael accuses Sandra of alienating the children against him and Sandra accuses Michael of verbally and emotionally abusing the children.
>
> Sandra has been the primary care giver for the children during their lifetimes. The parties mutually agreed that Sandra would remain home to raise the children which would enable Michael to pursue his career as a physiatrist to financially support the family. In matters other than the children's relationship with Michael, Sandra has the ability to provide the children with love, affection and guidance. Neighbors Tom and Barbara Thorson testified at trial about her good qualities as a mother to the children and numerous affidavits attesting to her ability as a mother have been submitted during the course of the divorce proceedings. The children have expressed a preference to live with Sandra and love, affection and strong emo-

tional ties exist between Sandra and the children. This bond formed and existed prior to the commencement of the divorce action. There was testimony at trial from Dr. Oates that the emotional relationship between Sandra and the children, although strong, was unhealthy due to enmeshment. The Court has determined that Sandra has alienated the children from Michael during the pending divorce proceedings. The issue of alienation will be addressed at a later point in this Order.

Michael's contact with the children has been extremely limited since this divorce action was commenced. The testimony and evidence indicates that Michael's relationships with D.M. and R.M. were strained even before the divorce. D.M. was often openly disrespectful of Michael. The evidence indicates that the parties attempted counseling as early as 2006 to address these and other family relationship problems. Until shortly before trial, D.M. indicated that she did not want to have a relationship with her father.

Michael's relationship with R.M. prior to the divorce, while better than his relationship with D.M., was also strained. Michael had related to R.M. through sports and through coaching his youth teams. However, R.M. no longer wanted Michael involved in his activities due to his obsessive and anxious behavior. R.M. did not want to ride in a car with Michael due to his temper and his comments about driving off a bridge. Michael made several inappropriate comments in the presence of the children which have been exhaustively addressed during this divorce proceeding. Since the divorce was commenced, R.M. has not expressed a desire to be with Michael and has resisted attempts at reunification through therapy.

Michael's relationship with C.M. was described as good before the divorce. Michael coached C.M.'s youth sports teams. After the divorce was commenced, Michael's contacts with C.M. have been limited by Sandra and his relationship with Michael has deteriorated.

Michael has worked hard during the divorce proceedings to try to rebuild relationships with his children. He has followed through with counseling and has undergone evaluations to prove that he is not an abusive parent or a danger to the safety of the children. Despite Michael's efforts, it appears that he has a difficult time relating to the children emotionally. Conversation with the children was difficult for Michael even before the divorce. While Michael will apologize for his actions, he is unwilling or unable to acknowledge the impact his actions may have on the children (i.e. his statements about driving off a bridge, or holding a knife to his chest and then throwing it across the room, or moving out during Christmas vacation without telling anyone).

The children have indicated that they are not comfortable around Michael. While some of the children's reactions, in particular the comments that they do not feel safe with Michael, may be the result of alienation by Sandra, his relationship with the children and his ability to respond to their emotional needs was deficient prior to the commencement of the divorce proceedings. This appears to be due, in large part, to how the family dynamics evolved over an extended period of time during the marriage and also to Michael's inappropriate actions in front of the children in the months prior to the parties' separation.

[¶ 9] Under N.D.C.C. § 14–09–06.2(1)(c), which addresses the "child's de-

velopmental needs and the ability of each parent to meet those needs, both in the present and in the future," the district court found:

Apart from the dysfunctional family dynamics, the children are doing quite well. They are healthy. They are doing well in school and are involved in extracurricular and community activities. Both parents have placed a high priority on the children's participation in extracurricular activities to the extent that, at times, it contributed to the marital and family problems which precipitated this divorce and also to some of the problems regarding parenting time and reunification counseling after the divorce was commenced. The children have not had any contact with law enforcement and there are no reports of behavior problems apart from testimony from Sandra and Theresa Porter that C.M. has been more physically aggressive lately. Michael has also reported aggressive behavior by C.M.

Both parents have mental health issues which affect their ability to meet the children's developmental needs, both now and in the future. Michael has been diagnosed with Generalized Anxiety Disorder and Adjustment Disorder with Depressed Mood, Chronic (by Dr. Bennet, Exhibit 24A); Anxiety Disorder NOS and Adjustment Disorder with Mixed Anxiety and Depressed Mood (by Dr. Hein–Kolo, Exhibit 22); or Adjustment Disorder with Anxiety (Dr. Ben Haynes, Exhibit 20). Whatever the diagnosis, Michael presents as a very nervous or anxious person. As was evident at trial, he has a hard time sitting still. He also tends to obsess over such things as the children's practice schedules, diet, and homework to the extent that the children either do not want to engage in those types of activities or do not want Michael to be involved. This behavior contributed to the marital and parenting difficulties prior to the time of the parties' separation.

Sandra has an Axis II diagnosis of Antisocial and Narcissistic Personality Traits (Dr. Hein–Kolo, Exhibit 26). This causes her to place herself in an overly positive light, to be defensive, and to deny any responsibility for the breakdown in the marriage or in the children's relationships with Michael. Expert testimony at trial suggested that persons with this type of diagnosis are not good candidates for treatment.

The Court has determined that Sandra engaged in behavior which has alienated the children from Michael since the date of the parties' separation. This behavior includes perpetuating a belief in the minds of the children that Michael is not safe for them to be with, even though at least four doctors and/or therapists who have treated or evaluated Michael (Ben[ ] Haynes, Valerie Lange, Nancy Hein–Kolo, and Barbara Oates) have concluded that he is not a danger to himself or the children. Despite engaging in alienating behavior, Sandra has demonstrated the ability to love, nurture, and encourage the children. She testified that she wants the children to have a relationship with their father; however, her actions have not encouraged that relationship.

[¶ 10] Under N.D.C.C. § 14–09–06.2(1)(d), which addresses the "sufficiency and stability of each parent's home environment, the impact of extended family, the length of time the child has lived in each parent's home, and the desirability of maintaining continuity in the child's home and community," the district court found:

Both parents provide a stable home environment. The children have lived their entire lives in the marital home

which continues to be occupied by Sandra. The parties mutually agreed that Sandra would be a stay-at-home mother after the children were born. The children have relationships with neighborhood and school friends. The children are active in school and community events and both parents have encouraged this involvement.

Michael and Sandra moved to North Dakota from the Chicago area immediately following their marriage in 1990. The extended family for both parties resides out of state. Throughout the marriage, the parties and the children made numerous trips to Chicago to visit relatives. The children continue to have contact with Sandra's extended family.

Michael purchased a home in Bismarck when the parties separated in December 2007. The fact that he did this without telling Sandra and the children, and that he did this and moved out while Sandra and the children were in Chicago for vacation over the Christmas holiday, has contributed to the animosity demonstrated during these divorce proceedings. The home purchased by Michael has a market value of approximately twice the value of the marital home occupied by Sandra and the children. Michael's home provides a physical environment which is sufficient for him and the children. However, except for short visits by C.M. while this divorce has been pending, the children have not lived in the home with Michael.

[¶ 11] Under N.D.C.C. § 14-09-06.2(1)(e), which addresses the "willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child," the district court found:

Both parties say that they would encourage a relationship between the children and the other parent; however, neither parent has demonstrated the willingness or ability to do so. This has been an extremely contentious divorce. Up through the time of trial, the parties have been able to agree on virtually nothing.

Sandra states that she wants the children to have a relationship with Michael. However, she continues to sabotage such a relationship by resisting reunification therapy and alienating the children by perpetuating the notion that the children are not safe with Michael. Although Michael has made his own share of mistakes in the presence of the children (i.e., demonstrating anger when driving, threatening to drive off a bridge, holding a knife to his heart and then throwing it across the room), Sandra has exacerbated the situation by telling the children th[at] Michael threatened to hang himself in his office (Michael denies ever making such a statement), by following Michael during his parenting time with C.M., by calling the Abused Adult Resource Center after C.M.'s first overnight visit with Michael, and by unnecessarily communicating details about the divorce proceedings with the children.

Michael has not demonstrated the willingness or ability to facilitate a relationship between Sandra and the children. When asked at trial about Sandra's positive qualities as a mother, Michael initially could not think of anything to say. He later testified that Sandra took care of the children's basic needs and helped them with their activities and homework. He went on to testify that he thinks that Sandra does things "just to look good."

Michael assesses most of the fault for the break-up of the marriage and the problems with his relationship with the children to Sandra. Similarly, Sandra assesses the fault for the break-up of the

marriage and the relationship problems to Michael. Neither party is willing to accept any responsibility for the current state of their relationship and neither party is willing to say anything good about the other party as a parent.

[¶ 12] Under N.D.C.C. § 14–09–06.2(1)(g), which addresses the "mental and physical health of the parents, as that health impacts the child," the district court found:

> Both parents are physically healthy. However, as stated above, both parents have mental health issues which impact the children. Michael has been diagnosed with anxiety disorder, adjustment disorder, and depressed mood. Sandra has been diagnosed with antisocial and narcissistic personality traits.

> Michael is able to function in the workplace with his condition. However, he appears to be a very nervous or anxious person. He has a hard time sitting still. The children described his constant pacing at home and his obsession with their sports schedules. He has a difficult time relaxing. The children have indicated that they do not feel comfortable around Michael.

> Sandra's condition causes her to place herself in an overly positive light, to be defensive, and to deny any responsibility for the breakdown in the marriage or in the children's relationships with Michael. Expert testimony at trial suggested that persons with this type of diagnosis are not good candidates for treatment. Although she is capable of demonstrating good parenting skills and caring for the children, she appears to be unable to foster and support a relationship between the children and Michael.

[¶ 13] Under N.D.C.C. § 14–09–06.2(1)(h), which addresses the "home, school, and community records of the child and the potential effect of any change," the district court found:

> All three children are doing well in the home, in school and in the community. Because Sandra has been a stay-at-home mother and has always been the primary care giver for the children, a change of residential placement for the children would likely be very difficult and upsetting for the children. Given the circumstances which existed prior to the parties' separation, it appears that this would have been the case even without the alienation which has occurred since the beginning of these divorce proceedings.

[¶ 14] Under N.D.C.C. § 14–09–06.2(1)(m), which addresses "[a]ny other factors considered by the court to be relevant to a particular parental rights and responsibilities dispute," the district court found:

> The parties have very different personalities and parenting styles. Michael is more rigid and controlling and Sandra is more passive. Michael cites Sandra's failure to support his decisions as a parent as one of the reasons for their marital discord. Both parties blame the other for the break-up of the marriage. Neither party has shown any inclination to compromise or to work with the other to resolve any of the issues in this divorce.

> The GAL [guardian ad litem], the Parenting Investigator, and the Reunification Counselor, Dr. Oates, recommend that Michael be awarded primary residential responsibility for R.M. and C.M. due the alienation caused by Sandra. They advocate that R.M. and C.M. be placed in Michael's care, that they undergo extensive counseling, and that Sandra and D.M. have no contact with R.M. and C.M. until recommended by the Reunification Counselor.

The GAL and Michael's counsel direct the Court to the case of *Wolt v. Wolt*, 2010 ND 26, 778 N.W.2d 786, in which the North Dakota Supreme Court affirmed a district court decision to award primary residential responsibility to one parent and to restrict parenting time for the other parent to limited supervised parenting time until a recommendation for increased parenting time was made by a counselor. The Court in *Wolt* noted that parental alienation is a significant factor in determining primary residential responsibility and that a party 'who willfully alienates a child from the other parent may not be awarded custody based on that alienation.' *Id.* at ¶ 10.

The Court finds this case to be factually different from *Wolt*. In *Wolt*, the mother and the children had a good relationship until the parties separated. The Court determined that the father alienated the children from the mother after the parties separated and awarded primary residential responsibility to the mother, with limited supervised parenting time to the father, to be increased upon recommendation by a counselor.

In the instant case, if both parties had enjoyed a good relationship with the children at the time of separation and their preference to be with Sandra was primarily due to the alienation which occurred following separation, the Court might agree that an order similar to the one issued by the Court in *Wolt* would be appropriate. However, the evidence indicates that the children's relationship with Sandra, and their preference to be with her, can be attributed to the lifestyle choices and family dynamics which evolved over a long period of time during the marriage.

The parties agreed a short time after D.M. was born that Sandra would be a stay-at-home mother with the children. As such, she was the primary care giver and provided them with emotional support and nurturing. Michael worked to build his physiatrist practice and Sandra assisted him with this endeavor, both by providing management services for the clinic and by taking care of the children so that Michael could work.

Michael has always been an anxious and active person. He would engage in his own recreational activities and would also relate to the children through sports. However, his obsession with the children's activities led D.M. and later R.M. to not want Michael involved in their activities any longer. They described Michael's nervous behavior and his constant pacing. They described Michael's frequent yelling in the home (Michael claims he did not "yell," but merely raised his voice). Michael also threatened to drive off a bridge and held a knife to his chest while the children were present. These actions contributed to the strained relationship between Michael and the children prior to the time the parties separated.

Because of Michael's actions prior to the separation and his poor relationship with D.M. and R.M., the Court does not agree that it would be in the best interests of R.M. and C.M. for Michael to be awarded primary residential responsibility, while allowing Sandra only limited supervised visitation. Such an order would also restrict D.M.'s contact with R.M. and C.M. While D.M. strongly identifies with Sandra and has been resistant to reunification with Michael, the evidence at trial indicates that the three children have a close relationship with each other and splitting them up would be difficult.

On the other hand, Sandra should not be rewarded for her alienation of the children from Michael. The Court does not believe that allowing Sandra to con-

tinue to have primary residential responsibility for R.M. and C.M. would be in their best interests because Sandra has not demonstrated that she could encourage and support a parent/child relationship between the children and Michael. The Court does not believe that awarding either party primary residential responsibility of R.M. and C.M. is in the children's best interests. However, neither party has shown any willingness to co-parent with the other.

[¶ 15]   The district court concluded:

The parties shall have joint decision making responsibility for the children. In the event the parties are unable to agree on any decision, they shall first attempt to resolve the matter through the Parenting Coordinator. If the matter cannot be resolved through the parenting coordinator, then the parties shall be required to mediate the matter. The parties shall be jointly and equally responsible for the costs and expenses of the mediator.

The parties shall be awarded joint primary residential responsibility for R.M. and C.M. Sandra shall be awarded primary residential responsibility for D.M.

At the time of this Order, D.M. is a senior in high school and will be 18 years of age before a final judgment is entered. The testimony at trial indicated that she is closely aligned with her mother and does not want to live with her father. A short time before trial, she indicated to the Parenting Investigator that she did want to have a relationship with her father. Any court order for primary residential responsibility or parenting time regarding D.M. would likely be ineffective. As an adult, she and Michael will need to determine on their own, what type of relationship, if any, they will have.

Regarding R.M. and C.M., as discussed above, the Court determines that it would not be in the best interests of R.M. and C.M. for either parent to have primary residential responsibility to the exclusion of the other. Neither parent has indicated any willingness or ability to foster and support a relationship between the children and the other parent. The children have expressed a desire to reside with Sandra, which the Court concludes is due to the family dynamics that existed during the marriage, Michael's conduct in the household prior to the parties' separation, and the alienation of the children by Sandra during the divorce proceedings. Michael has a right to parenting time with the children, and it appears unlikely that he would be able to successfully re-establish a meaningful parent/child relationship with R.M. and C.M. if Sandra were to retain primary residential responsibility. The Court also recognizes that continued counseling will be necessary to re-establish Michael's relationship with R.M. and C.M. and that Michael's parenting time will need to be gradually increased over a period of time before a true joint residential responsibility situation can occur.

The court devised a detailed schedule that gradually increased Martiré's parenting time for R.M. and C.M. until it equaled Hendricksen Martiré's parenting time on June 1, 2011.

[¶ 16]   Martiré and the guardian ad litem argue Martiré should have been awarded sole primary residential responsibility based on Hendricksen Martiré's alienating the children from him. Hendricksen Martiré argues she should have been awarded sole primary residential responsibility because Martiré committed domestic violence, the "Parental Alienation Syndrome" has been discredited by schol-

ars, and children are harmed when the "Syndrome" is used as an excuse to place them in the custody of domestic violence perpetrators. The briefs of the guardian ad litem and Hendricksen Martiré outline the debate between the experts over the validity of the "Syndrome." We decline the invitation to resolve the debate over the "Syndrome." First, the district court's finding that Martiré did not commit domestic violence as defined in N.D.C.C. §§ 14–07.1–01(2) and 14–09–06.2(1)(j) is not clearly erroneous. Second, the court did not base its decision on the concept of a "Parental Alienation Syndrome." Rather, the court appropriately based its primary residential responsibility decision on the best-interest factors under N.D.C.C. § 14–09–06.2(1) and this Court's caselaw addressing situations where a parent has alienated the other parent from their children.

[¶ 17] This Court has often said "a parent who willfully alienates a child from the other parent may not be awarded custody *based on that alienation.*" *McAdams v. McAdams,* 530 N.W.2d 647, 650 (N.D. 1995) (emphasis added); *see also Wolt,* 2010 ND 26, ¶ 10, 778 N.W.2d 786; *Brown v. Brown,* 1999 ND 199, ¶ 21, 600 N.W.2d 869; *Loll v. Loll,* 1997 ND 51, ¶ 16, 561 N.W.2d 625. The district court's finding that Hendricksen Martiré alienated the children from Martiré is supported by the record. But the court also found Martiré effectively alienated himself from the children by his abnormal behavior during the marriage, and his actions combined with Hendricksen Martiré's actions caused the estrangement of his relationship with the children. This is not a case where alienation is attributable only to one parent.

[¶ 18] We have recognized that shared decision-making authority can be successful only when the parties have demonstrated an ability and willingness to cooperate in the children's best interests. *See, e.g., Hanson v. Hanson,* 2005 ND 82, ¶ 24, 695 N.W.2d 205; *Jarvis v. Jarvis,* 1998 ND 163, ¶ 36, 584 N.W.2d 84; *Zuger v. Zuger,* 1997 ND 97, ¶ 34, 563 N.W.2d 804. The district court found that the parties can agree "on virtually nothing" and that neither party is willing to facilitate a continuing relationship between the other parent and the children. The court nevertheless awarded the parties joint primary residential responsibility and joint decision-making responsibility for the children, finding it was in the children's best interests.

[¶ 19] Difficult residential responsibility cases may present a district court with "no other option." *Loll,* 1997 ND 51, ¶ 14, 561 N.W.2d 625. Placement of the children with a third party was not an option in this case because the court found joint primary residential responsibility was in the children's best interests and it does not appear the children had been in the actual physical custody of a third party for a sufficient period of time to develop a psychological parent relationship with that third party. *See, e.g., McAllister v. McAllister,* 2010 ND 40, ¶ 14, 779 N.W.2d 652. The best interests of children need not be sacrificed merely to foster general policies declared by this Court. *See BeauLac v. BeauLac,* 2002 ND 126, ¶ 18, 649 N.W.2d 210. The court's detailed order governing implementation of joint primary residential responsibility and decision-making authority is similar to other orders approved by this Court governing issues involving uncooperative parents. *See, e.g., Eberle v. Eberle,* 2010 ND 107, ¶ 24, 783 N.W.2d 254.

[¶ 20] The parties' arguments essentially boil down to improper requests that this Court reassess the credibility of witnesses, reweigh the evidence, and change findings of fact made by a district court that presided over a nine-day trial. Our

review of the evidence and the court's findings on the best interest factors does not leave us with a definite and firm conviction a mistake has been made. We conclude the court's award to the parties of joint primary residential responsibility for the younger children is not clearly erroneous.

## III

■ [¶ 21] Martiré argues the district court erred as a matter of law in setting his child support obligation at $6,127 per month, which is more than the presumptive amount of $4,250 under the Child Support Guidelines, because the court did not make "a finding that by a preponderance of evidence ... a deviation of the guidelines was appropriate."

[¶ 22] The Child Support Guidelines allow a district court to deviate upward from the presumptively correct child support amount in cases that involve an obligor that earns more than $12,500 per month. *See Hanson*, 2005 ND 82, ¶ 29, 695 N.W.2d 205. Under N.D. Admin. Code § 75–02–04.1–09(2)(b), the presumptively correct amount of child support is rebutted "if a preponderance of the evidence establishes that a deviation from the guidelines is in the best interest of the supported children and ... [t]he increased ability of an obligor, with a monthly net income which exceeds twelve thousand five hundred dollars, to provide child support."

[¶ 23] In the divorce decision, the district court ordered that Martiré continue to pay child support of $6,127 per month, the amount the court had previously ordered him to pay in October 2008. In its October 2008 decision, the court increased the child support amount from $4,250 to $6,127, reasoning:

> It appears that neither party has been completely forthright with the Court in setting forth income and expenses for

child support and spousal support purposes. However, based upon the net monthly income of $18,022 stated in Michael's financial statement, and the facts and circumstances of this case, the Court determines that, pursuant to N.D. Admin. Code § 75–02–04.1–09 [criteria for rebuttal of guideline amount], the amount of his monthly child support obligation may be increased to $6,127 (34% of $18,022).

[¶ 24] We conclude the district court's October 2008 decision contains findings sufficient to support a deviation upward from the presumptively correct guideline amount, and the findings are not clearly erroneous.

## IV

■ [¶ 25] Both parties challenge the district court's distribution of marital property. Hendricksen Martiré argues the court erred in valuing marital assets, erred in determining the extent of the marital estate, erred in its disposition of certain assets, and erred in awarding Martiré the major income-earning assets. Martiré argues the court's distribution of property is inequitable because debt offsets allowed to Hendricksen Martiré were undocumented. Martiré also argues the court erred in admitting, over his objection, the testimony and evidence submitted by four of Hendricksen Martiré's expert witnesses because those witnesses were not disclosed until shortly before trial.

■ [¶ 26] Under N.D.C.C. § 14–05–24(1), a district court must make an equitable division of the parties' marital estate in a divorce action. *Crandall v. Crandall*, 2011 ND 136, ¶ 17, 799 N.W.2d 388. To equitably distribute the parties' property and debts, the court must first determine the value of the marital estate, including all assets held by either party.

*Stephenson v. Stephenson*, 2011 ND 57, ¶ 9, 795 N.W.2d 357. This Court presumes a district court's property valuations are correct, and valuations within the range of evidence presented are not clearly erroneous. *Id.* We treat a district court's property distribution as a finding of fact which will not be reversed on appeal unless the distribution is clearly erroneous. *Kosobud v. Kosobud*, 2012 ND 122, ¶ 6, 817 N.W.2d 384.

[¶ 27] The decision whether to allow expert testimony rests within the sound discretion of the district court and will not be overturned on appeal unless the court has abused its discretion. *Praus ex rel. Praus v. Mack*, 2001 ND 80, ¶ 34, 626 N.W.2d 239. A district court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, or when its decision is not the product of a rational mental process. *Clark v. Clark*, 2006 ND 182, ¶ 7, 721 N.W.2d 6. Furthermore, error may not be predicated on a district court's admission or exclusion of expert testimony unless a substantial right of the complaining party is affected. *See Oberlander v. Oberlander*, 460 N.W.2d 400, 403 (N.D.1990); N.D.R.Ev. 103(a).

[¶ 28] Upon our review of the record, we conclude that the parties have failed to establish the district court's findings relating to the marital property distribution are clearly erroneous, and that Martiré has failed to establish the court abused its discretion in allowing the challenged expert testimony.

V

[¶ 29] Martiré argues the district court erred in awarding Hendricksen Martiré spousal support, claiming she is healthy, has an advanced education and is capable of returning to the workforce. Hendricksen Martiré argues the spousal support award of $5,000 per month is in-sufficient because the court erred in computing Martiré's earning capacity which was based on Martiré's "false and fraudulent representations."

[¶ 30] In *Paulson v. Paulson*, 2011 ND 159, ¶ 4, 801 N.W.2d 746, we explained:

Under N.D.C.C. § 14–05–24.1, a district court may order a party in a divorce action to pay spousal support for any period of time. *Peterson v. Peterson*, 2010 ND 165, ¶ 13, 788 N.W.2d 296. In awarding spousal support, the district court must consider the relevant factors outlined in *Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (1952) and *Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966). *Duff v. Kearns–Duff*, 2010 ND 247, ¶ 14, 792 N.W.2d 916; *Peterson*, at ¶ 13. The *Ruff–Fischer* guidelines require the court to consider:

the respective ages of the parties, their earning ability, the duration of the marriage and conduct of the parties during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, their financial circumstances as shown by the property owned at the time, its value at the time, its income-producing capacity, if any, whether accumulated before or after the marriage, and such other matters as may be material.

*Duff*, at ¶ 14 (quoting *Krueger v. Krueger*, 2008 ND 90, ¶ 8, 748 N.W.2d 671). The court must also consider the needs of the spouse seeking support and the needs and ability to pay of the supporting spouse. *Duff*, at ¶ 14; *Peterson*, at ¶ 13.

Property distribution and spousal support are interrelated and must be considered together. *Kosobud*, 2012 ND 122, ¶ 14, 817 N.W.2d 384. A spousal support deter-

mination is a finding of fact, which will not be reversed on appeal unless it is clearly erroneous. *Paulson*, at ¶ 6.

[¶ 31] The district court noted each party had been awarded approximately one-half of the net marital estate. The court considered that Hendricksen Martiré was 48 years old, had been out of the workforce for 15 years caring for the children to further Martiré's career, and there was no evidence presented of employment opportunities or her earning potential. The court reasoned even if Hendricksen Martiré returned to work, she would earn significantly less than Martiré, and found it "unlikely that she could be equitably rehabilitated to make[ ]up for opportunities lost during the course of the marriage." The court found from the testimony at trial that Martiré "has an annual income of between $200,000 and $400,000," and that finding is supported by the evidence in the record.

[¶ 32] The district court appropriately considered the *Ruff–Fischer* guidelines. We conclude the court's award of spousal support to Hendricksen Martiré in the amount of $5,000 per month "until death, remarriage, or attaining the age of 65, whichever comes first," is not clearly erroneous.

## VI

[¶ 33] The parties challenge the district court's decisions on their post-trial motions. We review these rulings under the abuse of discretion standard. *See Sall v. Sall*, 2011 ND 202, ¶ 7, 804 N.W.2d 378; *Prchal v. Prchal*, 2011 ND 62, ¶ 27, 795 N.W.2d 693; *Christian v. Christian*, 2007 ND 196, ¶ 21, 742 N.W.2d 819; *Jarvis*, 1998 ND 163, ¶ 8, 584 N.W.2d 84. The parties have not shown the court's decisions are arbitrary, unreasonable, or unconscionable, or are not the product of a rational mental process. We conclude the court did not abuse its discretion in denying the post-trial motions.

## VII

[¶ 34] We do not address other arguments raised because they either are unnecessary to the decision or are without merit. The divorce judgment and the post-trial orders are affirmed.

[¶ 35] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING and DANIEL J. CROTHERS, JJ, concur.

SANDSTROM, Justice, dissenting.

[¶ 36] Although it would be nice to bring this case to an end, there is no reason to believe the decision by the majority will do so. These parents cannot get along, and giving them joint decision-making responsibility will only intensify the conflict. But more importantly, from an appellate court standpoint, the decision to award joint decision-making responsibility is contrary to our established case law, and I therefore dissent.

[¶ 37] In *McAdams v. McAdams*, 530 N.W.2d 647, 650 (N.D.1995), this Court said:

> As we said in *Johnson*[ *v. Schlotman*, 502 N.W.2d 831, 834 (N.D.1993) ]:
>> "A parent does have a duty to not turn a child away from the other parent by 'poisoning the well.' Notwithstanding the perceived imperfections in the other parent, a custodial parent should, in the best interests of the children, nurture the children's relationship with the noncustodial parent."
> We hold a parent who willfully alienates a child from the other parent may not be awarded custody based on that alienation.

[¶ 38] This Court most recently applied the *McAdams* principle in *Wolt v. Wolt*, 2010 ND 26, ¶ 10, 778 N.W.2d 786:

**464**

Additionally, this Court has said that "evidence of parental alienation is a significant factor in determining custody." *Brown[ v. Brown]*, 1999 ND 199, ¶ 21, 600 N.W.2d 869 (citing *Loll v. Loll*, 1997 ND 51, ¶ 16, 561 N.W.2d 625). "A party 'who willfully alienates a child from the other parent may not be awarded custody based on that alienation.'" *Brown*, at ¶ 21 (quoting *McAdams v. McAdams*, 530 N.W.2d 647, 650 (N.D.1995)).

[¶ 39] In the present case, the district court found parental alienation by Sandra Martiré:

> *The Court has determined that Sandra engaged in behavior which has alienated the children from Michael* since the date of the parties' separation. This behavior includes perpetuating a belief in the minds of the children that Michael is not safe for them to be with, even though at least four doctors and/or therapists who have treated or evaluated Michael (Benn Haynes, Valerie Lange, Nancy Hein–Kolo, and Barbara Oates) have concluded that he is not a danger to himself or the children. Despite engaging in alienating behavior, Sandra has demonstrated the ability to love, nurture, and encourage the children. She testified that she wants the children to have a relationship with their father; however, her actions have not encouraged that relationship.

(Emphasis added.) The district court further stated:

> On the other hand, Sandra should not be rewarded for her alienation of the children from Michael. The Court does not believe that allowing Sandra to continue to have primary residential responsibility for R.M. and C.M. would be in their best interests because Sandra has not demonstrated that she could encourage and support a parent/child relationship between the children and Michael.

[¶ 40] Nevertheless, the court awarded joint parental responsibility to both parents. In doing so, it failed to follow our case law, and thus clearly erred. I would reverse the district court's decision on primary residential responsibility and remand for entry of judgment placing sole responsibility with Michael Martiré as recommended by the guardian ad litem and other professionals.

[¶ 41] DALE V. SANDSTROM